807 A.2d 732

**Trone Tyrone ASHFORD**

v.

**STATE of Maryland.**

**No. 1856, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 12, 2002.

2

4

William E. Nolan, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Ann Bosse, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Attorney General, Diane E. Keller, Assistant Attorney General, Baltimore, Jack Johnson, State's Attorney for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before MURPHY, C.J., and CHARLES E. MOYLAN, JR. (retired, specially assigned), RAYMOND G. THIEME, JR. (retired, specially assigned), JJ.

MOYLAN, J.

This appeal will twice take us down memory lane, if "memory lane" is an appropriate trope for revisiting the turbulent constitutional law revolution of the 1960's. The appellant, Trone Tyrone Ashford, was convicted by a Prince George's County jury, presided over by Judge William B. Spellbring, Jr., of first-degree felony murder and of the use of a handgun in the commission of a felony. On this appeal, he raises three very generic contentions, each of which breaks down into a series of subcontentions. The generic challenges are

1. that Judge Spellbring erroneously denied his pretrial motion to suppress based on an alleged Fourth Amendment violation,

2. that Judge Spellbring erroneously failed to exclude his incriminating statement, and

3. that Judge Spellbring erroneously permitted the admission into evidence of an allegedly confidential spousal communication.

## 1. THE SEARCH AND SEIZURE ISSUE

The appellant's contention that Judge Spellbring erroneously denied his motion to suppress the physical evidence (a shotgun that turned out to be the murder weapon) actually consists of the three subcontentions:

a. that the warrant application lacked probable cause because of its failure to establish the veracity of the confidential informant;

b. that the "good faith exception" to the exclusionary rule was not available to the State because of the police affiant's bad faith in applying for the warrant; and

c. that the appellant's inculpatory statement was the suppressible "fruit of the poisonous [Fourth Amendment] tree."

All three subcontentions are based on the claim that the search and seizure warrant for the appellant's home was not supported by an adequate showing of probable cause. The application for the search warrant was not intended to be part of the investigation of this case. It was part of the investigation of an unrelated murderous episode that occurred one month after the murder in this case.

## The Investigation of a Second Murder Led to the Solution of the First Murder

September–October of 1998 was an unusually busy time for the appellant, "and thereby hangs [the] tale." [1] Late on the evening of September 12, 1998, the appellant and three of his colleagues stopped the Buick Regal in which they were riding on the side of Horsehead Road, just off Brandywine Road, in Prince George's County. The purpose of the stop was "to rob someone, just to get some cash and leave." As a lure, they raised the hood.

It was at that point that Jayson Brently Youmans drove up in a 1986 Ford Bronco. Youmans stopped in order to give the stalled car a jump start. One of the appellant's colleagues, "Ted," killed Youmans with a single blast from the shotgun owned by the appellant. Another colleague, "John," then fired five shots into Youmans with "Ted's .45" just "to make sure he was dead." For a month, the Youmans murder, known in Prince George's County as the "Good Samaritan Murder," remained unsolved.

On October 15, the appellant and two colleagues perpetrated a double murder (plus a third attempted murder) in what came to be known in Prince George's County as the "Dunkin Donuts" murders. Ironically, it was the unraveling of the "Dunkin Donuts" murders that led to the appellant's being implicated in the "Good Samaritan" murder. The search warrant for the appellant's home in the "Dunkin Donuts" case produced the shotgun that was the murder weapon in the

---

1. *As You Like It,* Act. II, Scene 7.

"Good Samaritan" case. The appellant's interrogation in the "Dunkin Donuts" case led to his confession in the "Good Samaritan" case.

The appellant was convicted on June 17, 1999, of felony murder and related offenses for his role in the "Dunkin Donuts" case. He received a life sentence without the possibility of parole. This Court affirmed those convictions in an unpublished opinion in *Ashford v. State* (No. 1342, September Term, 1999, filed on September 25, 2000). His sentence in this case of life imprisonment without the possibility of parole is to be served consecutively to his sentence in the "Dunkin Donuts" case.

### The Warrant Application

On the early evening of October 15, an individual who had witnessed the entire "Dunkin Donuts" criminal episode came into the Homicide Section Office of the Prince George's County Police Department and gave a full firsthand account of the crime. In that witness's account, the nickname "Trone" refers to the appellant, Trone Tyrone Ashford. The warrant application recited:

On October 15, 1998 at approximately 1900 hours, a witness that was present during this incident responded to the Homicide Section of the Prince George's County Police Department and advised the following. The witness stated that he was present when three persons known to him as "John Epps", "Trone" and "Alicia", entered the Dunkin Donuts, John Epps was armed with a shotgun. The witness further advised that he saw "John Epps" jump over the counter top. All three victims were ordered to the rear of the store. The "Alicia" subject was seen by the witness, attempting to open the cash registers of the Dunkin Donuts. The Epps suspect then returned to the vehicle and retrieved a gas can. The witness also advised that he heard several gunshots coming from inside the Dunkin Donuts. "John Epps", "Trone" and "Alicia" fled the store, after setting it on fire. All three entered a vehicle that was also occupied by this witness. While fleeing the scene, the witness was

told by the "Trone" suspect that he "killed three people in there."

The witness last saw the "Trone" suspect exit the suspect vehicle with the shotgun in hand. "Trone" entered his residence located at 4002 28th Avenue # 103, Temple Hills, Md. The witness had known the Epps subject for several years. He also knows the Trone and Alicia suspects. The witness had been in Trone's residence before in the recent past and had seen the shotgun inside the residence. The witness also identified the Epps and Trone suspects by photograph. The Epps suspect has been identified as (John Lemon Epps, B/M/9–5–78). The Trone suspect has been identified as (Trone Tyrone Ashford, B/M/6–9–72). Warrants have been issued charging both Epps and Ashford with two counts each of First Degree Murder.

Largely on the basis of that eyewitness account, Judge Thomas J. Love issued a warrant, on October 16, for the search of the appellant's residence. The subsequent search produced the shotgun that had been used in the murder of Jayson Youmans, as well as in the "Dunkin Donuts" murders. In denying the appellant's motion to suppress the shotgun in the present case, Judge Spellbring ruled:

Based on my review of the four corners of the warrant, I find that the warrant—the application for the warrant does contain probable cause; finding that the informant—I'm not sure that's the correct term—the witness who reports the information to the police has—is competent, based on the allegations contained in the warrant; is reliable because he reports matters against his own interests; and consequently, there is sufficient probable cause within the four corners of the application for the signature of the warrant by Judge Love.

### Invoking the *Merrick–Barber* Rule: The "*Merrick–Barber* Rule"?

The appellant challenges the probable cause for the search warrant by invoking what he refers to as the "*Merrick–Barber* Rule." Initially, we were somewhat non-plussed, never having

heard of the *"Merrick–Barber* Rule." The appellant refers to the opinion of the Court of Appeals in *Merrick v. State,* 283 Md. 1, 389 A.2d 328 (1978) and the opinion of this Court in *Barber v. State,* 43 Md.App. 613, 406 A.2d 668 (1979). From the two, the appellant distills the ostensible rule that if a confidential informant is not identified by name in a warrant application, then the fact that the information from the informant is a declaration against penal interest does not establish sufficient credibility to permit the information from the informant, standing alone, to constitute probable cause.

Just for the moment looking at the *Merrick* and *Barber* cases in their own right in their own time, we note immediately that the *"Merrick–Barber* Rule" is reduced to the *"Barber* Rule." *Merrick* does not stand for the rule which invokes its name. In *Merrick,* the informant was identified by name. The issue before the Court of Appeals was limited.

> "The narrow issue in this appeal is whether the statements of one who admits involvement in a criminal enterprise meets the 'veracity' prong because the statements appear to amount to a declaration against penal interest."

283 Md. at 6 n. 4, 389 A.2d 328. The holding was that a declaration against penal interest *ipso facto* establishes the declarant's credibility.

> [T]he probable credibility of the informant here was sufficiently shown on the sole basis of his statements against his penal interest.

283 Md. at 16, 389 A.2d 328.

The *Merrick* opinion expressly refrained from expressing an opinion on the subject for which the appellant cites it as authority.

> In the facts and circumstances of the case *sub judice,* we do not reach the question of the credibility of an *unidentified* informant on the sole basis of his declarations against penal interest.

283 Md. at 16 n. 11, 389 A.2d 328.

*Barber,* on the other hand, does stand for the proposition for which the appellant cites it. The informant was not identified by name. This Court held in *Barber* that in the case

of an unidentified informant, the giving of a declaration against penal interest was not enough, standing alone, to establish the informant's veracity.

> [W]e hold that an informant's credibility cannot be shown solely by declarations against penal interest where the informant has not been identified.

43 Md.App. at 620, 406 A.2d 668.

Without suggesting for a moment that the present case would have fallen under the "*Barber* Rule" even in 1979, the overarching and dispositive reality is that both *Merrick* and *Barber* lie on the far side of an unbridgeable doctrinal watershed. Both cases were inextricably rooted in the now abandoned two-pronged analysis of *Aguilar–Spinelli* for testing hearsay information in a warrant application. Both opinions are redolent with the language and with the unmistakable mind-set of *Aguilar–Spinelli*. Both opinions shared the fate of *Aguilar–Spinelli*.

As will be discussed, the very concept of examining an informant's veracity in a doctrinal vacuum chamber did not survive 1983. Quotations from *Merrick* and *Barber* are, therefore, sepulchral echoes from a mausoleum that has been shut tight for almost twenty years.

### The Two–Pronged Test of *Aguilar–Spinelli* Is Dead

The infamous two-pronged test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), has been dead for nineteen years. The appellant is calling to its ghost in this case.

The death of the *Aguilar–Spinelli* test is a particularly poignant subject for this Court. We in Maryland, and this Court specifically, went as far as any state in the country in taking the Supreme Court's lessons to heart and in constructing a highly elaborate framework for applying the two-pronged test of *Aguilar* and *Spinelli* in analyzing hearsay information in a warrant application. In *Stanley v. State,* 19 Md.App. 507, 313 A.2d 847, *cert. denied,* 271 Md. 745 (1974), this Court set out with elaborate specificity the various rules

and ramifications of the *Aguilar–Spinelli* two-pronged test. Indeed, as will be discussed, this Court's articulation of the test in *Stanley* played a not insignificant role in the overthrow of the entire *Aguilar–Spinelli* regime nine years later in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

As the test was ultimately fully elaborated, hearsay information from a confidential informant had to satisfy, quite independently, both the "basis of knowledge" prong ("How did the informant know what he was talking about?") and the "veracity" prong ("Why should we believe the informant?"). The "veracity" prong, in turn, bifurcated into two disjunctive spurs, the inherent-credibility-of-the-informant spur and the reliability-of-the-information-on-the-particular-occasion spur. From *Spinelli*, moreover, we distilled two curative devices for initial flaws in the respective prongs of *Aguilar*. Independent police verification could shore up the reliability spur of the "veracity" prong. Self-verifying detail could shore up the "basis of knowledge" prong. We distinguished between classes of informants, treating very differently, for example, "citizen-informers" and those "from the criminal milieu." With respect to the latter, we were obsessed with proven "track records." Both in the caselaw and on the continuing legal education circuit, *Aguilar–Spinelli* was a burgeoning cottage industry and we in Maryland exploited it to the fullest.

That now almost incomprehensible world came to an abrupt end on June 8, 1983, with the filing of the Supreme Court's decision in *Illinois v. Gates*. The opinion for the Court by Justice Rehnquist, excoriating the hypertechnicality that *Aguilar* and *Spinelli* had spawned, singled out this Court and our opinion in *Stanley v. State* as the *ne plus ultra* of "a labyrinthine body of judicial refinement" that "bears [little] relationship to familiar definitions of probable cause." 462 U.S. at 240–41, 103 S.Ct. 2317. Justice Rehnquist's opinion mentioned *Stanley v. State* by name on four occasions and quoted from it extensively. In only one minor regard did *Illinois v. Gates*, 462 U.S. at 229 n. 4, 103 S.Ct. 2317, note agreement with the Maryland Court of Special Appeals:

The decision in *Stanley,* while expressly approving and conscientiously attempting to apply the "two-pronged test" observes that "[t]he built-in subtleties [of the test] are such, however, that a slipshod application calls down upon us the fury of Murphy's law." 19 Md.App. at 528, 313 A.2d 847.

Indeed, the opinion of the Supreme Court of Illinois in *People v. Gates,* 85 Ill.2d 376, 53 Ill.Dec. 218, 423 N.E.2d 887 (1981), that was reversed by *Illinois v. Gates,* had itself relied on this Court's opinion in *Stanley v. State,* citing it and quoting from it on four occasions. It also had relied on Moylan, *Hearsay and Probable Cause: An Aguilar and Spinelli Primer,* 25 Mercer L.Rev. 741 (1974).

*Illinois v. Gates* expressly "abandoned" the *Aguilar–Spinelli* two-pronged test, with its distinct diagnosis of each prong independently, and substituted a "totality of circumstance" approach.

> For all these reasons, we conclude that *it is wiser to abandon the "two-pronged test" established by our decisions in Aguilar and Spinelli.* In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. The task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. We are convinced that *this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from Aguilar and Spinelli.*

462 U.S. at 238–39, 103 S.Ct. 2317 (emphasis supplied).

In *West v. State,* 137 Md.App. 314, 328–29, 768 A.2d 150 (2001), Judge Thieme described the Supreme Court's rejection of the *Aguilar–Spinelli* analysis.

*Occasionally in the law,* as elsewhere, *there is a house cleaning.* Old concepts are discarded or dusted off and refurbished, and space is vacated in order to make room for new theories. Such was the case when it became apparent that the structured nature of these guidelines often undermined law enforcement to an extent greater than the Supreme Court believed necessary. In *Gates,* Justice Rehnquist, writing for the Court, expressed concern over the difficulty faced by non-lawyer magistrates in applying the complex set of analytical and evidentiary rules that had developed under the *Aguilar–Spinelli* test. Reasoning that a less rigid common sense analysis would help alleviate this problem, *the Supreme Court abandoned these strict guidelines in favor of a "totality of the circumstances" approach.*

(Emphasis supplied).

*Illinois v. Gates* was a sharp and decisive break with the past. In *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), the Supreme Judicial Court of Massachusetts, however, had attempted to take the moderating position espoused by the appellant in this case. Because 1) the informant in the *Upton* case was "anonymous" or unidentified and 2) the informant's "statement was not against penal interest," the Massachusetts high court ruled that the "veracity" prong had not been satisfied. The Massachusetts court chose to read *Illinois v. Gates,* however, as merely ameliorating the rigors of the two-pronged test by providing that adequate police corroboration could make up for an initial deficit.

"The informant's veracity and the basis of his knowledge are still important but, where the tip is adequately corroborated, they are not elements indispensible to a finding of probable cause."

390 Mass. at 568, 458 N.E.2d at 721. In much the same manner, the appellant here seeks to soft-pedal the crack of doom. ("The Supreme Court parted ways, however, with the strict *Aguilar–Spinelli* calculus in the case of *Illinois v. Gates.*"). "Parted ways ... with the strict ... calculus"?

The Supreme Court, however, resoundingly repudiated the effort by Massachusetts to equivocate as to the import of *Illinois v. Gates* or to salvage any part of the "two-pronged test".

We think that *the Supreme Judicial Court of Massachusetts misunderstood our decision in Gates. We did not merely refine or qualify the "two-pronged test." We rejected it,* as hypertechnical and divorced from "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

466 U.S. at 732, 104 S.Ct. 2085 (emphasis supplied).

As it plainly said, the Supreme Court "did not merely refine or qualify." It "rejected." If *Gates* was the obituary for the *Aguilar–Spinelli* test, *Upton* was the stake to its heart.

The appellant in this case, relying exclusively on two anachronistic Maryland cases from the heyday of *Aguilar* and *Spinelli,* focuses in on the erstwhile "veracity" prong as if *Illinois v. Gates* were little more than a minor bump in the road. Thoroughly chastened by *Illinois v. Gates,* however, this Court is an unlikely candidate to be tempted to salvage any relic from that now thoroughly discredited *ancien regime.* R.I.P.

### The Maryland Case Law Confirms
### The Death of *Aguilar–Spinelli*

In making his preliminary argument that the *Aguilar–Spinelli* framework of analysis still retains some residual vitality, the appellant cites *Trussell v. State,* 67 Md.App. 23, 506 A.2d 255 (1986); *State v. Lee,* 330 Md. 320, 624 A.2d 492 (1993); and *Winters v. State,* 301 Md. 214, 482 A.2d 886 (1984). Those cases, however, do not provide the solace he claims to find in them. In *Trussell,* this Court pointed out that:

*Illinois v. Gates* substituted this looser [totality of circumstances] approach for the earlier and more rigorous "two-pronged test" of *Aguilar v. Texas* and *Spinelli v. United States.*

67 Md.App. at 29, 506 A.2d 255. The case does not support an independent analysis of veracity.

In *State v. Lee,* the holding first by this Court, 93 Md.App. 408, 613 A.2d 395 (1992), and then by the Court of Appeals was that probable cause had not been established. The "unidentified confidential informant" in *Lee* did not speak from personal knowledge but simply passed on information from a more remote unidentified individual. As Judge Bloom pointed out for this Court:

> The bulk of the evidence contained in the affidavit relates to the statements of an unidentified confidential informant whose information stems not from personal knowledge, but from the uncorroborated statements of yet another unidentified "unwitting individual."

93 Md.App. at 417, 613 A.2d 395. In affirming the decision of this Court, Chief Judge Robert Murphy observed for the Court of Appeals:

> The factual predicate set out in Mathew's application for a warrant, to which we must confine our review, consisted essentially of a second-hand rumor: the officer merely recounted information about Lee passed through the informant from his brother.

330 Md. at 326–27, 624 A.2d 492.

The fault of the affidavit in *Lee* was not that it failed to satisfy the "veracity" prong independently, but that, even under the "totality of circumstances" approach mandated by *Illinois v. Gates,* it did not establish either the source's veracity or his basis of knowledge. It was the sum total that was lacking, not a severable part.

> The affidavit did not explain how the brother obtained the incrimination information about Lee. The affidavit did not describe how the brother concluded he could buy drugs from Lee. To be sure, since *Gates,* the law of search warrants no longer insists upon the strict two-prong test of an informant's knowledge and credibility derived from *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89

S.Ct. 584, 21 L.Ed.2d 637 (1969). Yet the veracity and basis of knowledge of the informant clearly remain relevant to a probable cause determination. *Winters, supra,* 301 Md. at 227, 482 A.2d 886. *The affidavit failed entirely to address either factor in the instant case.*

330 Md. at 327, 624 A.2d 492 (emphasis supplied). In the case now before us, by contrast, the informant witnessed the crime and spoke from detailed firsthand knowledge. The basis of knowledge was abundantly overflowing. *State v. Lee* does not stand for the proposition that veracity should be analyzed independently, the proposition for which the appellant, of necessity, cites it.

*Winters v. State* not only does not support, but squarely refutes, the appellant's position in this case. In that case, as in this, the defendant sought to analyze the veracity of the critical informant in a vacuum.

> *Appellant's basic argument is that if the information obtained from Eader is not a declaration against penal interest, then the veracity and reliability of this source is not demonstrated* in the affidavit; the foundation for this reasoning are the principles set forth in *Aguilar v. Texas* and *Spinelli v. United States.*

301 Md. at 227, 482 A.2d 886 (emphasis supplied). The Court of Appeals squarely rejected that approach of looking at veracity and basis of knowledge as separate and unrelated issues:

> [A]ppellant's singular reliance on *Aguilar* and *Spinelli* is unfounded in view of the Supreme Court's decision in *Gates.*
>
> *Gates* replaced the rigid technical analysis of the reliability of informant data in *Aguilar* and *Spinelli* with a more flexible approach.

*Id.*

Most pertinently for the case now before us, the Court of Appeals in *Winters* then pointed out that an arguable deficiency as to the proof of veracity can be compensated for by a strong showing, as in this case, with respect to the informant's basis of knowledge.

"Veracity," "reliability," and "basis of knowledge" are still considered relevant inquiries. *Gates,* 462 U.S. at 233, 103 S.Ct. at 2329, 76 L.Ed.2d at 545. However, *rather than give them independent status, they are to be considered in the "totality of circumstances* analysis that traditionally has guided probable cause determinations: *a deficiency in one may be compensated for,* in determining the overall reliability of a tip, *by a strong showing as to the other,* or by some other indicia of reliability." *Id.*

*Id.* (emphasis supplied).

In the *Winters* case, just as in the case now before us, the informant had "provided a significant amount of detailed information in the affidavit, most of which was observed first-hand." 301 Md. at 228, 482 A.2d 886.

As to the compensatory and carry-over capacity of detailed firsthand knowledge, *Illinois v. Gates* provided an emphatic endorsement.

Conversely, even if we entertain some doubt as to an informant's motives, *his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.*

462 U.S. at 234, 103 S.Ct. 2317 (emphasis supplied). Indeed, the statement by this Court in *Stanley,* 19 Md.App. at 530, 313 A.2d 847, that one analysis could not borrow from another prompted the express disapproval of the Supreme Court in *Illinois v. Gates:*

One frequently cited decision, *Stanley v. State, supra* at 530, 313 A.2d 847, remarks that "the dual requirements represented by the 'the two-pronged test' are analytically severable and an 'overkill' on one prong will not carry over to make up for a deficit on the other prong."

462 U.S. at 230 n. 5, 103 S.Ct. 2317. *Illinois v. Gates* took precisely the opposite tack:

We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case.

462 U.S. at 230, 103 S.Ct. 2317.

Even in the cross hairs of a precedential juggernaut, however, the appellant maintains a cheerful outlook on the benign effect of *Illinois v. Gates* that is as remarkable as it is delusional:

Even under the *Gates* totality-of-the-circumstances test, however, the *Merrick–Barber* rule of informant credibility remains as possibly the last bright-line rule in determining probable cause within warrant applications.

### The *"Merrick–Barber* Rule" As a Stealth Argument

The *"Merrick–Barber* Rule" appears to have been as unfamiliar to the appellant at the time of the suppression hearing as it was to us until this appeal. In the brief argument before Judge Spellbring, neither case was mentioned by name or even alluded to. There was no argument about the propriety of using the declaration against penal interest rationale as a device to bolster challenged credibility. In the context of declarations against penal interest, there was no mention of *Barber*'s distinction between a declarant named in the warrant application and an unnamed declarant.[2]

---

**2.** In terms of accountability for one's statements serving as a guaranty for the accuracy of those statements, the declarant in this case was fully accountable. He was known to the police. He came into the police station, hours after a high profile crime had occurred, and was formally debriefed as a witness to the crimes. His role was fully described in the warrant application. Whether he was named in the warrant application is beside the point.

As the Supreme Court explained in *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the meaningful distinction is between 1) an anonymous informant and 2) one known to the police and, therefore, accountable to the police.

Unlike a tip from *a known informant* whose reputation can be assessed and *who can be held responsible if her allegations turn out to be fabricated,* see *Adams v. Williams* (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Alabama v. White.*

We are not going to dismiss the *"Merrick–Barber"* argument on the ground of non-preservation, however, lest it give rise to the false impression that the argument might have had merit if it had been preserved.

### The Totality of Circumstances Was Bounteous

■ Under the "totality of circumstances" approach of *Illinois v. Gates*, the warrant application in this case satisfied all current requirements *magna cum laude.* Quite aside from the fact that a number of the witness's descriptions of the crime were fully corroborated by independent police observations at the crime scene,[3] the eyewitness account bore every indication of authenticity.

---

(Emphasis supplied). To be unnamed in a warrant application is not the same thing as to be unknown to the police

To be sure, in *Barber v. State* this Court got hung up on the participle "unidentified" and treated an informant unidentified to the warrant-issuing judge as the equivalent of an informant unknown to the police and, therefore, beyond any sanction for making a false report. In that regard, we now conclude that *Barber* was wrong and we would repudiate it if we thought it still had any vitality. It seems excessive, however, to repudiate a doctrinal corpse.

3. Even under the now discredited *Aguilar–Spinelli* framework of analysis, the "veracity" prong in this case would have passed muster. Even if the unidentified "witness" were deemed not to be inherently credible under *Aguilar,* then *Spinelli's* curative device of independent police verification, by verifying some of what the witness had reported, would have served to bolster the challenged veracity. *Stanley v. State,* 19 Md.App. at 529, 313 A.2d 847.

The witness stated that "Alicia" attempted to open the cash registers at Dunkin Donuts. The witness also stated that three persons entered Dunkin Donuts armed with a shotgun. The police reported that they received a "Holdup Alarm" from Dunkin Donuts. The witness stated that the three persons set the store on fire. The police arrived to find Dunkin donuts "in flames." The witness stated that he "heard several gunshots coming from inside the Dunkin Donuts" and that "Tronc" told him immediately thereafter that he had "killed three people in there." The police reported that they "found three victims suffering from gunshot wounds," two of whom were pronounced dead at the scene.

Without rehashing a whole body of now quaint and discarded law dealing with independent police verification, the "veracity" prong in this case would clearly have been satisfied under the combined *Aguilar–Spinelli* test.

In terms of the contribution it made to the totality, the eyewitness's "basis of knowledge" in this case was a cornucopia. The informant witnessed the crime at close hand and from start to finish. He knew all three of the perpetrators by name and by past acquaintanceship. He saw all three enter the Dunkin Donuts shop, one of them armed with a shotgun. He saw "John Epps" jump over the counter top, and he saw "Alicia" attempting to open the cash registers. He saw Epps go to the car for a gas can, and he saw the three perpetrators set the Dunkin Donuts shop on fire.

Moving outside, he heard several gunshots coming from inside the store. The three perpetrators and the witness left the scene in the same vehicle. Whether the "witness" was an accomplice or whether he was simply well enough known to the perpetrators that they saw no necessity to eliminate him as a witness is not known. While driving away from the crime scene, the appellant told the witness that he had "killed three people in there." The witness saw the appellant leave the automobile and go into his residence with the shotgun in his hand.

When within hours of a high-profile multiple murder, the police obtain a firsthand account with both the certain identification of the perpetrators and the pin-point location of the murder weapon, a judge's declination to issue a search warrant for the murder weapon on such a predicate would amount to a dereliction of duty.

Under the circumstances, it is not even necessary to mention the strong presumption of validity that warrants enjoy or the highly deferential standard of review that suppression hearing judges and appellate judges alike must apply to another judge's earlier decision to issue a warrant. Judge Spellbring was eminently correct in denying the appellant's motion to suppress.

---

We have reduced these purely museum-piece observations to a footnote and have refrained from making them part of our decision on this appeal, however, lest we give the false impression that this relic of *Aguilar–Spinelli* analysis still harbors some breath of life. It does not.

## A Defense in Depth: The "Good Faith" Exception to the Exclusionary Rule

■ Even though the State does not need a second line of defense to fall back upon in this case, it is still reassuring to know that it is there. Even if, *arguendo,* the probable cause for the search warrant were to be deemed to have fallen short, the application for the warrant was not so pitifully bereft of substance as to be laughed out of court. Under the circumstances, it would clearly have been reasonable for the officers to have relied upon the warrant, and the exclusion of the evidence would serve no deterrent purpose. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). As an exercise in caution, Judge Spellbring ruled that the second line of defense was impregnably in place:

I also find that even if someone were to find that the application does not contain sufficient probable cause, under *Leon* the police would certainly have a good faith basis to rely on Love's signing of the warrant and its execution pursuant to his signature of the warrant.

As to the efficacy of that second line of defense, our observation in *Herbert v. State,* 136 Md.App. 458, 488, 766 A.2d 190 (2001), well describes the lay of the tactical terrain.

A second strong incentive for searching with warrants is *the almost "fail-safe" security of being able to fall back on the "good faith" exception* to the Exclusionary Rule. *Massachusetts v. Sheppard* (1984); *United States v. Leon* (1984). *Even when the warrant is bad, the mere exercise of having obtained it will salvage all but the rarest and most outrageous of warranted searches.* The "good faith" exception, by contrast, is almost universally unavailable in warrantless contexts. See *Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). *Under the Sheppard Leon "good faith" exception to the Exclusionary Rule, it is hard for the State to lose a suppression hearing.* It is equally hard to figure out why the State would not do everything in its

power to exploit that overwhelming advantage whenever possible.

(Emphasis supplied). Even if the warrant here were arguably flawed, it would hardly qualify for what *Herbert* referred to as one of "the rarest and most outrageous of warranted searches."

*Leon* and *Sheppard* created the "good faith" exception to the exclusionary rule. Because it is generally a cautious practice for an appellate court "never to say 'never,'" *Leon* added that there could be rare and extreme situations in which an officer might forfeit his claim to the "good faith" exception. *Leon*'s brief list of those rare and extreme situations is now religiously intoned in every appellate opinion and is promiscuously invoked by every defendant faced with the foreclosing effect of the "good faith" exception. The actual appearances of such extreme situations, however, are about as rare as the appearances of Halley's Comet.

The appellant argues:

Here, the erroneous finding of probable cause within the warrant was most likely the product of unfamiliarity on the part of the police and the magistrate with the *Merrick–Barber* rule. Nevertheless, the absence of the informant's identify, in the instant case, prohibited a finding of probable cause. This is a simple and basic rule that has remained virtually unchanged for over twenty years. Thus, the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

The appellant goes on:

Here the *Barber* case placed law enforcement on notice that warrants like the one in the present case inherently lack probable cause. ... It is not unreasonable to expect reasonably well-trained officers to know of, as well as understand the commonsense basis for, the *Merrick–Barber* rule.

With defense counsel apparently ignorant of the so-called "*Merrick–Barber* Rule" at the time of the suppression hearing and with ourselves utterly oblivious to the very existence of

such a "rule," it would be the height of ill grace to hold that Detective Piazza was unreasonable for being equally unenlightened. Even if, *arguendo,* the probable cause showing here was marginally short (it was not), this would not have been an instance where the "affidavit [was] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923, 104 S.Ct. 3405.

### The Non–Poisoned Fruit Of the Non–Poisonous Tree

As a final Fourth Amendment claim, the appellant contends that if the search that produced the shotgun was unconstitutional, then his confession that followed in its wake should also have been suppressed as the "fruit of the poisonous tree."

The quick answer might be that this claim was never raised below and is utterly unpreserved for appellate review. An even quicker answer, however, is that, as we have discussed at length, there was no Fourth Amendment violation. There being no poisonous tree, there could be no poisoned fruit. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and *Ryon v. State,* 29 Md.App. 62, 349 A.2d 393 (1975), both relied on by the appellant and both dealing with the attenuation of taint, are, therefore, irrelevant.

### 2. THE CONFESSION ISSUE

The appellant's contention that Judge Spellbring erroneously denied his motion to suppress his written statement actually consists of the four subcontentions:

a. that the written statement was the "fruit of the poisonous tree," to wit, the unattenuated product of an antecedent *Miranda* violation;

b. that the written confession was also the fruit of the antecedent *Miranda* violation under Article 22 of the Maryland Declaration of Rights;

c. that he never effectively waived his *Miranda* rights before making the written statement; and

d. that the written statement was involuntary under 1) Maryland non-constitutional law, 2) the Due Process Clause of the federal Fourteenth Amendment, and 3) Article 22 of the Maryland Declaration of Rights.

## The Inquisitorial Sequence

On October 19, 1998, the appellant was in lawful police custody for his involvement in the "Dunkin Donuts" case. At about 5:00 p.m. that day, the appellant was transported from the County Detention Center in Upper Marlboro to the Homicide Division in Landover. At approximately 5:15, Sergeant Norman Miller began to interrogate the appellant. Initially, the appellant seemed eager to talk, in the apparent belief that the interrogation was to be about the "Dunkin Donuts" case. At about 5;40, Sergeant Miller indicated that he wanted to talk about another case. When he left the interview room at 5:44, he indicated that he wanted to get a photo to show the appellant and that he wanted to talk to some people.

The initial phase of the interrogation lasted until shortly before 9:00 p.m., although Sergeant Miller broke it off and left the room for an hour between 5:44 and 6:44 and for another half an hour between 7:33 and 8:00. At 6:17, Sergeant Miller returned briefly to the room to show the appellant a photograph of Donnie Comber, who was involved in the killing of Youmans. When Sergeant Miller came back into the room at 6:44, it was to tell the appellant that the police were talking with the appellant's wife and with another person about "the killing of the white guy" and not about the "Dunkin Donuts" case. It was only when Sergeant Miller, at some time after 8:15, informed the appellant that the appellant's wife had implicated him and others in the killing of Youmans that the appellant first acknowledged his involvement.

That was the moment when Sergeant Miller broke off the interrogation, indicated that he wanted to get the appellant's statement in writing, and proceeded to advise the appellant of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and to take the appellant's

written waiver of those rights. Until that moment, the appellant had not been *Mirandized.*

With ample support in the testimony of Sergeant Miller, Judge Spellbring found that the appellant's admission prior to receiving the *Miranda* warnings was not in a traditional sense involuntary. Because of the *Miranda* violation, however, that initial acknowledgment of guilt was ruled to be inadmissible in the State's case in chief.

> I must find that the statements made prior to the advice of rights and waiver form received as State's Exhibit number 1, *I find that they are voluntary* based on the evidence before me, *but I find that they are inadmissible in the State's case in chief* based upon the failure of the police to advise Mr. Ashford of his rights under *Miranda,* and to take an appropriate waiver of those rights under *Miranda.*

(Emphasis supplied).

*Miranda* was violated. That is beyond dispute. What remains to be seen is what, if any, adverse impact the antecedent *Miranda* violation will have on the post 9:00 p.m. written statement that was taken after the *Miranda* warnings were given and the appellant then waived any rights under *Miranda.*[4]

---

4. At oral argument, we pressed the State as to why it ran the risk of interrogating the appellant without *Mirandizing* him first. He was in custody and he was being interrogated. *Miranda,* therefore, applied.

Obviously, the State was seeking some psychological edge by getting him to admit guilt orally before having the interrogation take on a more formal tone. To do so, however, was to run a serious risk. If the hearing judge were to find no causal connection between the earlier violation and the subsequent statement, the State would survive the gamble. There is always the danger, however, that a suppression hearing judge, emotionally irate at the tactic, might find the later statement to have been the tainted product of the earlier violation.

What, if anything, an appellate court could do about such a finding would depend, of course, upon the nature of the finding. If the hearing court found taint as a matter of law, the appellate court, invoking *Oregon v. Elstad,* would probably reverse and remand for a finding as a matter of fact. If the hearing judge found taint as a matter of fact, however, that finding would be, for all intents and purposes, unassailable. The question remains, "Is the tactic worth the risk?"

### "Fruit of the Poisonous Tree" Doctrine: Federal

In this case, Judge Spellbring found as a matter of fact that the earlier *Miranda* violation did not taint the subsequent *Mirandized* statement.

[T]hat statements [were] taken without advisement and waiver of the rights contained within the *Miranda* decision does not in and of itself cause any subsequent statements which are made after an advisement and waiver of the rights in the *Miranda* decision to be suppressed as fruits of the poisonous tree. This is a fact that must be considered, with all of the other facts, to determine whether the subsequent statement is a voluntary statement or not.

But it is not a controlling fact in determining the admissibility of any subsequent statements. I find that, based upon the willingness and desire even of Mr. Ashford to talk to the Prince George's County Police on October 19th, that the statements taken without advisement and waiver of the *Miranda* rights do not effect the voluntariness of the statements that I have received as State's Exhibit number 2, the written statement and the question and answer statement of Mr. Ashford.

I find that because of his willingness and desire as expressed to the police to talk to them on that night, that the statement received as State's Exhibit number 2 is a voluntary statement made after the appropriate advice and waiver of the rights under the *Miranda* decision as contained within State's Exhibit number 1, and for the reasons contained herein I will deny the defense motion to suppress State's Exhibit number 2.

Having failed to persuade Judge Spellbring that the earlier *Miranda* violation tainted the subsequent written confession as a matter of fact, the appellant now seeks to convince us that the subsequent statement was conclusively tainted as a matter of law. He urges that we apply the "fruit of the poisonous tree" doctrine, with the *Miranda* violation as the primary taint

and the subsequent statement as a clearly unattenuated consequence.[5]

The appellant relies on "the cat out of the bag" notion as coined by Justice Jackson in *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). In *Bayer*, there had been an admittedly improper first confession because it had been taken in violation of *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), requiring that an arrestee be taken promptly before a magistrate. There was a subsequent properly obtained confession. The issue was whether the second confession had been irrevocably tainted by the first.

The trial court had admitted the second confession. The United States Court of Appeals for the Second Circuit reversed, 156 F.2d 964, 970, citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), and holding that the second confession was "patently the fruit of the earlier one." The Supreme Court granted *certiorari*. The appellant now quotes four sentences from the Supreme Court opinion of Justice Jackson and relies heavily on them:

> Of course, after an accused has once *let the cat out of the bag* by confession, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. *He can never get the cat back in the bag.* The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first.

331 U.S. at 540, 67 S.Ct. 1394 (emphasis supplied). The appellant neglects to quote the very next sentence, which turns a dramatic "about face":

> But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use,

---

5. For a fuller examination of the "fruit of the poisonous tree" doctrine, see *Gibson v. State*, 138 Md.App. 399, 402–19, 771 A.2d 536 (2001).

perpetually disables the confessor from making a usable one after those conditions have been removed.

331 U.S. at 540–41, 67 S.Ct. 1394. In *Bayer,* the Supreme Court actually reversed the Second Circuit and held that "the admission of the confession was not in error." *Id.*[6]

The appellant nonetheless relies on the power of the metaphor. "Once the cat is out of the bag, it cannot be put back in." "Once the toothpaste is squeezed out, it can never be put back in the tube." The question remains, however, whether these metaphoric conclusions are sometimes true, as a matter of fact, or always true, as a matter of law.

## A. *Oregon v. Elstad*

The appellant, in arguing for exclusion as a matter of law, immediately confronts two closely related problems. One is the ambiguous and indeterminate constitutional status of *Miranda v. Arizona* generally. The second problem for the appellant is *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), specifically. An understanding of *Miranda's* troubled history is necessary to place *Oregon v. Elstad* in a more intelligible context. Before trying to put the whole issue of *Miranda's* quasi-constitutional status in historic perspective, we shall decide this issue on the basis of *Oregon v. Elstad. Oregon v. Elstad* is clearly and straightforwardly dispositive, whether one enjoys the longer view as to its place in history or not.

Michael Elstad, an eighteen-year-old suspected of burglary, was arrested at his home. He was questioned in his living room without having been given his *Miranda* warnings. He admitted his involvement in the burglary. An hour later, at the station house, he was *Mirandized* and gave a fuller written confession. The trial judge excluded the first confession but admitted the second. The Oregon Court of Appeals

---

**6.** Ironically, the incredible staying power of the *United States v. Bayer* opinion rests not on the holding, which goes in one direction, but on Justice Jackson's felicitous phraseology which, at least preliminarily, seems to go in the other.

reversed, holding that the brief period of time between the two confessions did not attenuate the taint. Citing *United States v. Bayer*, the Court of Appeals concluded that the "cat was sufficiently out of the bag to exert a coercive impact on [Elstad's] later admissions."

In a 6–3 decision with the majority opinion authored by Justice O'Connor, the Supreme Court reversed the Oregon court. Justice O'Connor initially noted that Elstad's arguments "rely heavily on metaphor." 470 U.S. at 303, 105 S.Ct. 1285. She cautioned that both the "fruit of the poisonous tree" metaphor and the "cat out of the bag" metaphor "should not be used to obscure fundamental differences between the role of the Fourth Amendment exclusionary rule and the function of *Miranda*." 470 U.S. at 304, 105 S.Ct. 1285.

In cautioning against too facile a reliance on "fruit of the poisonous tree" cases involving Fourth Amendment violations, Justice O'Connor pointed out that the Fifth Amendment is concerned with the ultimate trustworthiness of the evidence, whereas the Fourth Amendment is concerned with deterring unreasonable police behavior. As long as the confession itself is trustworthy, it is not the function of exclusion to sanction the police for having failed to give *Miranda* warnings. Judicial disapproval of the police behavior has no part to play in determining admissibility.

> [A]s we explained in *Quarles* and *Tucker*, a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the "fruits" doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. "The exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth."

470 U.S. at 306, 105 S.Ct. 1285.

*Elstad* further reasoned that only a constitutional violation *per se* will trigger exclusion under the "fruit of the poisonous tree" doctrine.

*Respondent's contention* that his confession was tainted by the earlier failure of the police to provide *Miranda* warnings and must be excluded as "fruit of the poisonous tree" *assumes the existence of a constitutional violation.*

470 U.S. at 305, 105 S.Ct. 1285 (emphasis supplied). It went on to point out that a *Miranda* violation is not necessarily a constitutional violation.

*The Miranda exclusionary rule* serves the Fifth Amendment and *sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation.*

470 U.S. at 306, 105 S.Ct. 1285 (emphasis supplied). The opinion reinforced that conclusion with earlier Supreme Court precedents.

Justice Stevens expresses puzzlement at our statement that a single failure to administer *Miranda* warnings is not in itself a violation of the Fifth Amendment. Yet the Court so held in *New York v. Quarles* and *Michigan v. Tucker.*

470 U.S. at 306 n. 1, 105 S.Ct. 1285.

The Supreme Court took pains to explain that a *Miranda* violation can occur even when the confessions in issue would not be deemed to have been taken in violation of due process.

The Court in *Miranda* required suppression of many statements that would have been admissible under traditional due process analysis by presuming that statements made while in custody and without adequate warnings were protected by the Fifth Amendment.

470 U.S. at 304, 105 S.Ct. 1285. A *Miranda* violation is not *ipso facto* a constitutional violation.

*Miranda's* preventive medicine provides *a remedy even to the defendant who has suffered no identifiable constitutional harm.*

470 U.S. at 307, 105 S.Ct. 1285 (emphasis supplied). A statement taken in violation of *Miranda* is not *ipso facto* a coerced statement.

The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced.

470 U.S. at 310, 105 S.Ct. 1285.

Justice O'Connor made it clear that a subsequent statement must be assessed in terms of its own inherent voluntariness and is not automatically tainted by an antecedent *Miranda* violation.

> *If errors are made by law enforcement officers in administering the prophylactic Miranda procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself.* It is an unwarranted extension of *Miranda* to hold that *a simple failure to administer the warnings, unaccompanied by any actual coercion* or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. *Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.*

470 U.S. at 309, 105 S.Ct. 1285 (emphasis supplied).

The Supreme Court then came to grips with a nuanced variation on the cause-and-effect theme. Even if the earlier *Miranda* violation did not directly produce the subsequent *Mirandized* statement, the earlier statement itself, taken in violation of *Miranda*, might have its own catalytic effect under the "cat out of the bag" theory. It is not, under this variation of the theory, "cause #1" that produces "effect #2," but "effect #1" that produces "effect #2." The Supreme Court summarized this nuanced argument.

> The Oregon court nevertheless identified *a subtle form of lingering compulsion, the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate.* But endowing the psychological effects of *voluntary* unwarned admissions with

constitutional implications would, practically speaking, disable the police from obtaining the suspect's informed cooperation even when the official coercion proscribed by the Fifth Amendment played no part in either his warned or unwarned confessions. As the Court remarked in *Bayer:*

> "[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag."

470 U.S. at 311, 105 S.Ct. 1285 (emphasis supplied).

The Supreme Court refused to allow an earlier statement that was voluntary, even if taken in violation of *Miranda,* to serve as a trigger for secondary exclusion.

> *This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion* or compromises the voluntariness of a subsequent informed waiver. . . .
>
> There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case.

470 U.S. at 312, 105 S.Ct. 1285 (emphasis supplied).

The Supreme Court's conclusion in *Oregon v. Elstad* was unequivocal that a second statement, following a mere *Miranda* violation, will not be automatically excluded and will be assessed in terms of its own inherent voluntariness.

> We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. *A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.* In such circumstances,

the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

470 U.S. at 314, 105 S.Ct. 1285 (emphasis supplied).

## B. The 34–Year Road From *Miranda* to *Dickerson*

Faced with the apparently dispositive effect of *Oregon v. Elstad,* the appellant seeks to deflect it by arguing that the decision of the Supreme Court two years ago in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), undercut most, if not all, of *Oregon v. Elstad*'s supporting rationale. Inexorably ingrained in that argument is the constitutional status of the *Miranda* warnings. Is the Supreme Court's prescription that the warnings must be given in cases of custodial interrogation something that is constitutional; non-constitutional; or, perhaps, quasi-constitutional?

The clash between *Miranda* and the position taken by the Fourth Circuit in *Dickerson* was 34 years in the making, but could have been anticipated from the beginning. The confrontation between the two diametric approaches cannot, however, be truly understood in a legal vacuum chamber. The vicissitudes displayed by the Supreme Court in its handling *Miranda* can only be understood against the larger backdrop of American political history, notwithstanding institutional protests that the political macrocosm has no bearing on the judicial microcosm.

The criminal law phase of the larger "Warren Court Revolution" lasted for almost precisely a decade. It may conveniently be measured as having run from the promulgation of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, in June of 1961, through the promulgation of *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, in June of 1971. *Miranda v. Arizona* came at just about the midpoint of that turbulent decade. The Warren Court majority was fairly perceived, by friend and foe alike, as liberal on the subject of defendants' rights and as activist in its approach to constitutional interpretation. *Miranda,* with its prescribed catechism

of four warnings, soon came to be looked on as the leading exemplar of that court's judicial activism.

By the time of the presidential election campaign of 1968, a significant body of antagonism had built up, nationwide, against the perceived activism of the Warren Court. The symbol for that Court that took on a talismanic quality came to be not *Mapp v. Ohio* or the school prayer cases, but *Miranda v. Arizona.* For better or for worse, Richard Nixon's 1968 campaign plank of anti-Warren Court, generally, and anti-*Miranda,* specifically, "played well in Peoria." In a brief 18-month period in 1970–71, moreover, then President Nixon got the opportunity to remake the Supreme Court, with four new appointees including the new chief justice.

The question inevitably soon arose as to what impact, if any, the larger political fortunes would have on *Miranda v. Arizona.* During the life of the Warren Court, three cases had come before it involving *Miranda* issues. The defendants won all three. It is not without significance that in all three cases, *certiorari* had been granted at the request of the defense. *Miranda v. Arizona; Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

By 1971, the political complexion of the Supreme Court had, as a result of the 1968 election, changed dramatically. It was even called by some the "Burger Nixon Court." To the surprise of almost all observers, however, the new court did not overrule *Miranda.* What it did do was to chip away at *Miranda,* 1) holding it to be inapplicable in a wide variety of circumstances; 2) holding it to be, even when applicable, easily satisfied or waived; and 3) consigning it to less than full constitutional status in an ambiguously lesser role as an "implementing" or "prophylactic" rule.

In the decade between 1971 and the filing of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, in 1981, eleven *Miranda*-related cases came before the new Supreme Court. The prosecution won eleven out of eleven. Perhaps even more significantly, *certiorari* had been granted at the

request of the prosecution in nine out of the eleven cases. *Miranda* was clearly suffering disfavored status. Indeed, in *Dickerson v. United States,* Chief Justice Rehnquist, after expressing some doubt as to "[w]hether or not we would agree with *Miranda's* reasoning and its resulting rule, were we addressing the issue in the first instance," 530 U.S. at 443, 120 S.Ct. at 2336, 147 L.Ed.2d at 419, explained why there was no compelling need to overturn 34 years of *stare decisis.*

> If anything *our subsequent cases have reduced the impact of the Miranda rule on legitimate law enforcement,* while reaffirming the decision's core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief.

530 U.S. at 443, 120 S.Ct. at 2336, 147 L.Ed.2d at 420 (emphasis supplied). The Court apparently felt that it had chained the tiger.

During that initial decade of unrelieved disfavor, *Miranda* was held to be inapplicable because of the absence of custody in three situations. *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). It was found to be inapplicable because of the absence of interrogation in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).[7]

---

7. The conversational context that was held not to have been "the functional equivalent of interrogation" in *Rhode Island v. Innis* was virtually indistinguishable from the conversational context that had been held to have been "the functional equivalent of interrogation" in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ("the Christian burial speech"). The only meaningful distinction between the two cases was that *Rhode Island v. Innis* was a *Miranda* case, whereas the reversal in *Brewer v. Williams* was based upon the Sixth Amendment right to counsel.

The defense, indeed, had urged *Miranda* on the Supreme Court in *Brewer v. Williams* and many observers were anxiously looking to that case as the "fish or cut bait" moment when the Supreme Court would have either to reverse a conviction on the basis of *Miranda* or to overrule *Miranda.* The Supreme Court, however, ignored *Miranda* and,

The *Miranda* rights were held not to have been adequately invoked in [Warden] *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). They were held to have been easily waived in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). A *Miranda* violation was given diminished status in federal habeas corpus appeals in [Warden] *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

In that decade of unbroken disfavor, the three cases most erosive of the constitutional status of *Miranda* were the three where there were found to have been violations of *Miranda* calling for the exclusion of statements from the prosecution's case in chief. In none, however, was the *Miranda* violation then held to have been of sufficient gravity to trigger the exclusion of either 1) derivative evidence or 2) the subsequent use of the *Miranda*-violative statement. In *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), Justice Rehnquist wrote for the Court in holding that a *Miranda* violation was not enough to trigger second-level exclusion under the "fruit of the poisonous tree" doctrine. He distinguished police conduct that "directly infringed upon respondent's right against compulsory self-incrimination" and the "separate question" of "whether it instead violated only the prophylactic rules developed to protect that right." 417 U.S. at 439, 94 S.Ct. 2357. The opinion went on to announce that the "procedural safeguards" created by *Miranda* "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected" and to "provide practical reinforcement for the right." 417 U.S. at 444, 94 S.Ct. 2357. *Michigan v. Tucker* concluded that the

> *police conduct* at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but *departed only from the prophylactic standards*

---

to the surprise of many, based its decision on the then largely neglected Sixth Amendment right to counsel as a factor in confession law.

later *laid down* by this Court *in Miranda to safeguard that privilege.*

417 U.S. at 446, 94 S.Ct. 2357 (emphasis supplied).

In *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), a *Miranda*-violative statement was excluded from the prosecution's case in chief. As a mere *Miranda* violation, however, it could still be used for impeachment purposes in rebuttal. *Harris v. New York* must be contrasted with *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). In *Mincey,* a statement was excludable from the prosecution's case in chief because it was involuntary. As a true violation of a core constitutional principle, the statement, under the "fruit of the poisonous tree" doctrine, could not be used for any purpose, including impeachment. The "mere *Miranda* " violation in *Harris* had no such toxic powers.

*Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), was another case in which a statement had violated *Miranda* but was nonetheless deemed voluntary. Although it could not be used in the prosecution's case in chief, it could be used for impeachment purposes. The Court contrasted statements obtained in actual violation of the privilege against compelled self-incrimination "as opposed to [those] taken in violation of *Miranda.*"

Even after that initial decade of disfavor, the Supreme Court caselaw regularly continued to distinguish between true constitutional principles and the "prophylactic rules" of *Miranda.* See *Withrow v. Williams,* 507 U.S. 680, 690–91, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) ("*Miranda's* safeguards are not constitutional in character."); *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) ("[T]he *Miranda* Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights."); *Davis v. United States,* 512 U.S. 452, 457–58, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989).

In *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court reiterated that the "prophylactic *Miranda* warnings ... are not themselves protected by the Constitution." 467 U.S. at 654, 104 S.Ct. 2626. In recognizing the "public safety exception" to the "prophylactic rules enunciated in *Miranda,*" 467 U.S. at 653, 104 S.Ct. 2626, the Supreme Court expressly acknowledged that if the *Miranda* warnings had been an imperative of the Fifth Amendment itself, such an exigency exception would have been impossible.

As already discussed, *Oregon v. Elstad* is peppered with such characterizations of *Miranda*'s less than full constitutional status. Indeed, in his dissent in *Oregon v. Elstad,* Justice Brennan accurately summed up what the Supreme Court had done, for better or for worse, with *Miranda v. Arizona.*

> [T]he Court has engaged of late in a studied campaign to strip the *Miranda* decision piecemeal and to undermine the rights *Miranda* sought to secure.

470 U.S. at 319, 105 S.Ct. 1285 (dissenting opinion by Brennan, J.). In his dissent in *Dickerson v. United States,* Justice Scalia agreed:

> Despite the Court's Orwellian assertion to the contrary, it is undeniable that later cases have "undermined [*Miranda*'s ] doctrinal underpinnings."

530 U.S. at 461, 120 S.Ct. at 2346, 147 L.Ed.2d at 431 (dissenting opinion by Scalia, J.)

## C. *Dickerson* at the Fourth Circuit

The Supreme Court's relegation of *Miranda,* over the decades, to something less than full constitutional status rendered inevitable the question that ultimately came before the United States Court of Appeals for the Fourth Circuit in *United States v. Dickerson,* 166 F.3d 667 (1999).

In the first wave of virulent anti-*Miranda* feeling following the case's promulgation in 1966, the Congress of the United States enacted in 1968 what became 18 U.S.C. § 3501. That provision made the admissibility of confessions in federal trials

turn exclusively on traditional voluntariness. Both the Fourth Circuit in its *Dickerson* opinion and the Supreme Court in *Dickerson v. United States,* 530 U.S. at 436, 120 S.Ct. at 2332, 147 L.Ed.2d at 415, recognized that Congress's intent had been to overrule *Miranda:*

> *Given § 3501's* express designation of voluntariness as the touchstone of admissibility, its *omission of any warning requirement,* and the instruction for trial courts to consider a nonexclusive list of factors relevant to the circumstances of a confession, *we agree with the Court of Appeals that Congress intended by its enactment to overrule Miranda.*

(Emphasis supplied). For 30 years, that Congressional act was essentially overlooked, largely because the Justice Department steadfastly refused to invoke it.

Initially, Dickerson had been indicted for bank robbery in northern Virginia. He was questioned by the F.B.I. without having been first *Mirandized.* The statement he gave was nonetheless deemed voluntary in traditional terms. The federal District Court suppressed that statement because of the *Miranda* violation. The government took an interlocutory appeal to the Fourth Circuit.

At the Fourth Circuit, the theory raised by the court *sua sponte* was that since the *Miranda* catechism was simply a set of "implementing" or "prophylactic" rules, it represented nothing more than the Supreme Court's acting in its supervisory capacity. In that capacity, of course, such rules could be overridden by an act of Congress. As the Supreme Court recognized in *Dickerson v. United States,* 530 U.S. at 436, 120 S.Ct. at 2332, 147 L.Ed.2d at 415:

> Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution.

The theory continued that in enacting § 3501, Congress had overridden *Miranda.*

The issue before the Fourth Circuit was clear. If *Miranda* were, indeed, constitutional, 1) it could not be modified by an act of Congress and 2)it was binding on the states. If, on the

other hand, *Miranda* were not constitutional, 1) the Congress could override it with an enactment such as § 3501 and 2) the states were at liberty to ignore it.

The Fourth Circuit concluded that both the wording of the *Miranda* opinion itself and its subsequent characterizations by the Supreme Court indicated that *Miranda* was not of full constitutional stature.

> [W]hether Congress has the authority to enact § 3501 turns on whether the rule set forth by the Supreme Court in *Miranda* is required by the Constitution. Clearly it is not. *At no point did the Supreme Court in Miranda refer to the warnings as constitutional rights.* ... *Since deciding Miranda, the Supreme Court has consistently referred to the Miranda warnings as "prophylactic" and "not themselves rights protected by the Constitution."* We have little difficulty concluding, therefore, that § 3501, enacted ... pursuant to Congress's unquestioned power to establish the rules of procedure and evidence in the federal courts, is constitutional.

166 F.3d at 672 (emphasis supplied). The Fourth Circuit forced the Supreme Court to confront its own awkward handling of an embarrassing precedent.

## D. *Dickerson* at the Supreme Court

As the *Dickerson* case arrived at the Supreme Court, the inertial weight attaching to the 34–year–old precedent was extremely heavy. After acknowledging that the Court might not "agree with *Miranda*'s reasoning and its resulting rule, were [it] addressing the issue in the first instance," 530 U.S. at 443, 120 S.Ct. at 2336, 147 L.Ed.2d at 419, the Court went on nonetheless to observe that "the principles of *stare decisis* weigh heavily against overruling it now." *Id.* In concluding that there was no compelling reason to overrule *Miranda*, even if as a purely academic matter it had been wrongly decided, Chief Justice Rehnquist pointed out two factors in favor of not disturbing the *status quo*.

One was that "our subsequent cases have reduced the impact of the *Miranda* rule on legitimate law enforcement." 530 U.S. at 443, 120 S.Ct. at 2336, 147 L.Ed.2d at 420. The need was not as great as it might have been in 1966. The other was that, even for those who dislike *Miranda,* the cure might prove to be worse than the disease.

[E]xperience suggests that the totality-of-the-circumstances test which § 3501 seeks to revive is more difficult than *Miranda* for law enforcement officers to conform to and for courts to apply in a consistent manner.

*Id.*

If *Miranda* were overruled, challenges to confessions would return to the pre-*Miranda* "totality of circumstances" test for assessing either 1) compulsion under the Fifth Amendment or 2) voluntariness under the Fourteenth Amendment (they are precisely the same thing). Suppression hearings that now take an hour could again, as they once did, take a day or a day and a half. In any event, the Supreme Court declined the invitation to overrule *Miranda. Id.*[8]

Declining to overrule *Miranda,* the Supreme Court had to confront the question of its constitutional status.

Congress may not legislatively supersede our decisions interpreting and applying the Constitution. This *case therefore turns on whether the Miranda Court announced a constitutional rule* or merely exercised its supervisory authority to regulate evidence in the absence of congressional direction.

---

8. Most American prosecutors were initially adamantly opposed to *Miranda v. Arizona,* in significant measure because it was a high-profile symbol of Warren Court activism. With the benefit of hindsight, however, no thinking prosecutor would wish to be rid of *Miranda* for the simple reason that returning to the "totality of circumstances" regime, which is what the disappearance of *Miranda* would inevitably entail, would be intolerable. *Miranda* has actually made the prosecutor's job much easier. Even prosecutors who never knew the olden times would "rather bear those ills we have than fly to others that we know not of." *Hamlet,* Act III, Scene 1.

530 U.S. at 437, 120 S.Ct. at 2332, 147 L.Ed.2d at 415 (emphasis supplied).

In then holding that *Miranda* was constitutionally binding on both the Congress and the states, the Court did to some extent stake out new ground.[9] To the great consternation of Justice Scalia, who in dissent argued for a "black and white" world in which a Supreme Court rule is either constitutional or non-constitutional,[10] the Supreme Court held that the *Miranda* warnings are constitutionally binding because they are "concrete constitutional guidelines for law enforcement agencies and courts to follow," 530 U.S. at 439, 120 S.Ct. at 2333, 147 L.Ed.2d at 416; "safeguards to protect precious Fifth Amendment rights," 530 U.S. at 450, 120 S.Ct. at 2340, 147 L.Ed.2d at 417 n. 4; requirements that are "resting on the Fifth Amendment privilege against self-incrimination," *id.;* rules with "constitutional underpinnings," *id.;* rules that "safeguard a fundamental trial right," *id.;* and rules that are "constitutionally based," 530 U.S. at 450, 120 S.Ct. at 2340, 147 L.Ed.2d at 417.

What the Supreme Court did in *Dickerson* is clear. How it did it is not so clear. Initially, it

---

**9.** As Justice Scalia observed in dissent:

> And so, to justify today's agreed-upon result, the Court must adopt a significant *new*, if not entirely comprehensible, principle of constitutional law.

530 U.S. at 445, 120 S.Ct. at 2337, 147 L.Ed.2d at 421 (dissenting opinion by Scalia, J.).

**10.** Justice Scalia sternly challenged his colleagues:

> It takes only a small step to bring today's opinion out of the realm of power-judging and into the mainstream of legal reasoning: the Court need only go beyond its carefully couched iterations that *"Miranda* is a constitutional decision," that *"Miranda* is constitutionally based," that *Miranda* has "constitutional underpinnings," and come out and say quite clearly: "We reaffirm today that custodial interrogation that is not preceded by *Miranda* warnings or their equivalent violates the Constitution of the United States." *It cannot say that, because a majority of the Court does not believe it.*

530 U.S. at 446, 120 S.Ct. at 2337, 147 L.Ed.2d at 421 (dissenting opinion by Scalia, J.) (emphasis supplied).

concede[d] that there is language in some of our opinions that supports the view taken by [the Fourth Circuit].

530 U.S. at 438, 120 S.Ct. at 2333, 147 L.Ed.2d at 416. Without then bringing itself to say that *Miranda* was, indeed, constitutional, the Court was content to observe that

> the majority opinion [in *Miranda* ] is replete with statements indicating that *the majority thought it was announcing a constitutional rule.*

530 U.S. at 439, 120 S.Ct. at 2333, 147 L.Ed.2d at 417 (emphasis supplied).

Then engaging in what Justice Scalia denigrated as "bootstrapping," the majority opinion predicated much of its argument for *Miranda's* constitutionality on the fact that "we have consistently applied *Miranda's* rule to prosecutions arising in state courts." 530 U.S. at 438, 120 S.Ct. at 2333, 147 L.Ed.2d at 416. The argument was that *Miranda* must be constitutional or the Court would not have been able to apply it to the states. There is an element there for reasoning backward from the effect to the cause. The impression is unmistakable that the affirming of *Miranda's* constitutional status came through clenched teeth.[11]

 Through clenched teeth or not, the *Dickerson* decision is clear. Whether denominated as "constitutional" *per se* or as "prophylactic rules implementing a constitutional protection," the *Miranda* rules are both 1) constitutionally binding on the states and 2) beyond the power of the national Con-

---

11. Justice Scalia accused the Court of having arrogated unto itself

 the power, not merely to apply the Constitution but to expand it, imposing what it regards as useful "prophylactic" restrictions upon Congress and the States. That is an immense and frightening anti-democratic power, and it does not exist.

 530 U.S. at 445, 120 S.Ct. at 2337, 147 L.Ed.2d at 421. He feared that the lack of appellate discipline could turn the Court into

 some sort of nine-headed Caesar, giving thumbs-up or thumbs-down to whatever outcome, case by case, suits or offends its collective fancy.

 530 U.S. at 454, 120 S.Ct. at 2342, 147 L.Ed.2d at 427 (dissenting opinion by Scalia, J.).

gress to modify or abrogate. Whether the rules are constitutional or quasi-constitutional, a violation of them, unlike a violation of the Fourth Amendment, is not so grave as 1) to prevent secondary use of a statement for purposes such as impeachment or 2) to trigger the "fruit of the poisonous tree" doctrine.

Thus, the continuing vitality of cases such as *Harris v. New York*, *Michigan v. Tucker*, and *Oregon v. Hass* is not in any way compromised by *Dickerson v. United States*. More pertinently, *Oregon v. Elstad* has not, to the appellant's chagrin, suffered any doctrinal erosion. Chief Justice Rehnquist's majority opinion expressly reaffirmed that decision.

The Court of Appeals also noted that in *Oregon v. Elstad*, we stated that "[t]he *Miranda* exclusionary rule ... services the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. *Our decision in that case-refusing to apply the traditional 'fruits' doctrine developed in Fourth amendment cases*—does not prove that *Miranda* is a nonconstitutional decision, but *simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."*

530 U.S. at 441, 120 S.Ct. at 2335, 147 L.Ed.2d at 418 (emphasis supplied).

*Oregon v. Elstad*, therefore, is just as foreclosing to the appellant's present subcontention as if *Dickerson v. United States* had never been decided.

### E. The Maryland Caselaw on "Mere *Miranda*" Violations

■ Both the Court of Appeals and this Court have regularly subscribed to *Oregon v. Elstad's* holding that a mere *Miranda* violation, not amounting to undergirding involuntariness, does not trigger exclusion under the "fruit of the poisonous tree" doctrine. In *Williams v. State*, 342 Md. 724, 761, 679 A.2d 1106 (1996), Judge Chasanow stated for the Court of Appeals:

We also reject Williams's contention that the "illegality" of the first, pre-*Miranda* statement "tainted" the second and third statements. Assuming the first statement was obtained in violation of *Miranda*, it was not coerced or involuntarily made. Since the second and third statements were made voluntarily after Williams received a *Miranda* warning, any "illegality" did not taint those subsequent statements. *See Oregon v. Elstad.*

In *Thomas v. State,* 128 Md.App. 274, 295, 737 A.2d 622 (1999), Judge Bloom observed for this Court:

[E]ven if the hospital conversation had been excluded, appellant's confession after receiving the standard *Miranda* warning would have been admissible in the absence of evidence that either it or the hospital conversation had been coerced. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), in which the Supreme Court held that a subsequent confession after *Miranda* warnings was not rendered inadmissible by prior uncoerced remarks in response to interrogation without *Miranda* warnings.

In *Brashear v. State,* 90 Md.App. 709, 721–22, 603 A.2d 901 (1992), Judge Garrity wrote for this Court:

[T]he Supreme Court has ruled that "a suspect who has once responded to unwarned, yet uncoercive, questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985). Thus, if the appellant did make an inadmissible statement to Corporal Smith, the statement, by virtue of the *Elstad* holding, did not taint the later statements given at the police station.

Ironically, even if *Oregon v. Elstad* had never been written, our result would not be different. In four pre-*Elstad* decisions, this Court anticipated the *Elstad* result and held that a mere *Miranda* violation would not trigger the exclusion of derivative evidence under the "fruit of the poisonous tree" doctrine.

In *Bartram v. State,* 33 Md.App. 115, 165, 364 A.2d 1119 (1976), *aff'd,* 280 Md. 616, 374 A.2d 1144 (1977), we observed:

> In recent months, both this Court and the Court of Appeals have recognized this pivotal difference between a constitutional violation itself which will trigger the "fruit of the poisonous tree" doctrine and a "mere *Miranda*" violation which will not trigger that doctrine.

In *Ryon v. State,* 29 Md.App. 62, 67, 349 A.2d 393 (1975), *aff'd,* 278 Md. 302, 363 A.2d 243 (1976), Chief Judge Orth stated:

> Thus, evidence obtained without full compliance with the *Miranda* dictates is not, for that reason, always to be excluded. So ... the failure to advise an accused during a custodial interrogation ... of his right to appointed counsel, did not in the circumstances existent, infringe against the right against compulsory self-incrimination but only violated the prophylactic rules developed to protect that right.

In *In Re Appeal No. 245,* 29 Md.App. 131, 349 A.2d 434 (1975), we distinguished between a mere *Miranda* violation, which would not trigger the "fruit of the poisonous tree" doctrine, and a truly involuntary confession, which would. In *Fried v. State,* 42 Md.App. 643, 402 A.2d 101 (1979), Judge Lowe expressly rejected reliance on *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), on which the appellant bases much of his argument in this case, and held to the contrary.

> [W]e have held that the doctrine of taint, *i.e.,* the fruit of the poisonous tree, does not follow from a "mere *Miranda*" violation, but applies only to confessions involuntarily obtained as by improper inducements and coercion.

42 Md.App. at 646, 402 A.2d 101.

As these cases illustrate, Maryland is obviously not following *Oregon v. Elstad* grudgingly. It is rather the case that *Oregon v. Elstad* has confirmed the correctness of what was Maryland's predisposition in any event.

## "Fruit of the Poisonous Tree" Doctrine: Maryland

■ The appellant makes an alternative argument that even if his written confession were not excludable under the federal Fifth Amendment, it should, because of the antecedent *Miranda* violation, be nonetheless deemed the excludable "fruit of the poisonous tree" under Article 22 of the Maryland Declaration of Rights. He is asking us to base a decision in his favor on "independent state grounds." What he is actually urging, however, is "independent state grounds" with a bizarre twist.

■ Independent state grounds means that a sovereign state may adopt its own constitutional protections which are broader than those provided by the United States Constitution. The state may then, by statute and caselaw, develop its own rules and procedures for administering such constitutional provisions. The concept of independent state grounds was badly perverted in the 1970's and 1980's, however, when some state courts, chagrined at what they felt to be a conservative turn by the United States Supreme Court away from its prevailing philosophy of the 1960's, used the doctrine to rally around dissenting Supreme Court opinions as to federal law rather than follow prevailing Supreme Court opinions with which they disagreed.

The appellant similarly is asking us, under the guise of independent state grounds, to reject the opinion of the Supreme Court in *Oregon v. Elstad* and to apply, in Maryland, the dissenting opinion of Justice Brennan in that case. We are being asked to modify the Supreme Court's mandated procedures for applying the federal "fruit of the poisonous tree" doctrine for derivative evidence resulting from a violation of the federal constitution.

■ The perversion of "independent state grounds" occurs when the concept is used not to interpret and apply genuinely independent state law, but when it is misused to adopt a preferred, but minority, version of federal law over the prevailing, but non-preferred, version of that law.

## A. *Lodowski v. State*

■ An insurmountable impediment to so radical a proposal is the opinion of Judge Orth for the Court of Appeals in *Lodowski v. State*, 307 Md. 233, 513 A.2d 299 (1986). In *Lodowski*, the appellant, frustrated by the Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), asked the Court of Appeals to interpret Article 22 of the Maryland Declaration of Rights more liberally than the Supreme Court had interpreted the Fifth Amendment. Judge Orth first explained the sound historic reasons for holding the two constitutional provisions to be *in pari materia:*

> Generally, comparable provisions of the two constitutions are deemed to be in *pari materia.* Here the relevant comparable provisions of the State and Federal Constitutions were adopted in times not far removed from each other.... [T]he concern with self-incrimination, assistance of counsel and due process of law was shared by those who framed the Federal Constitution and those who framed the Maryland Constitution. This concern on the part of the drafters of each constitution was implanted in the same climate and nurtured by the same hopes and fears. The provisions, so alike in aim and content, were proposed and accepted by those anxious to preserve the freedom and rights they had so arduously won.... We cannot say, in the frame of reference here, that the Federal provisions and the State provisions are to be construed and applied differently. This view is amply supported by what we have said in the past.

307 Md. at 245–46, 513 A.2d 299. The Court of Appeals then went on to reject the suggestion that Maryland diverge from the Supreme Court's interpretation of the Fifth Amendment.

Article 22 of the Maryland Declaration of Rights declares "[t]hat no man ought to be compelled to give evidence against himself in a criminal case." We said in *Blum v. State* that the Fifth Amendment was in *pari materia* with Article 22. We iterated this view in *Richardson v. State*

stating that "the privilege against compelled self-incrimination in Article 22 ... has long been recognized as being in *pari materia* with its federal counterpart." *See also State v. Panagoulis; Brown v. State....*

Lodowski urges that we diverge from the rationale of the holding in *Burbine* as to the Fifth Amendment and hold that under Article 22 his statement was inadmissible because the conduct of the police negated any ability he had to waive effectively his privilege against self-incrimination.... We decline to deviate on a State level under Article 22 from the rationale of *Burbine* regarding the Fifth Amendment.

307 Md. at 246–47, 513 A.2d 299.

*Lodowski v. State,* of course, is binding authority on us. Even if it were not, we would choose to follow it, because we subscribe to its rationale.

## B. Independent State Grounds and Reinventing the Wheel

Beyond *Lodowski v. State,* there is a vaporous unreality about what the appellant is asking us to do. The request illustrates a chronic problem with most latter-day champions of independent state grounds. They wander randomly back and forth across the state-federal line as if that boundary did not exist. They commingle the two bodies of law as if they were part of a single amalgamated whole. In this case, unlike *Lodowski,* the appellant is not asking for a more expansive interpretation of a Maryland constitutional provision. He is asking us to modify an exclusively federal procedure.

▇▇▇ This alternative argument made by the appellant is exclusively procedural. The thing the appellant would like us to modify, by overriding *Oregon v. Elstad,* in the operation of the "fruit of the poisonous tree" doctrine. That doctrine, dealing with the exclusion of secondary or derivative evidence, does not even come into play until there is established the so-called primary taint, to wit, a constitutional violation calling for the exclusion of the direct evidence.

■ The major premise for the appellant's exclusionary syllogism in this case was the violation of *Miranda v. Arizona. Miranda,* however, is exclusively federal law. A *Miranda* violation cannot trigger an exclusively Maryland-based exclusionary procedure. Maryland has no local counterpart of *Miranda.* If the Supreme Court overruled *Miranda* tomorrow, there would be no residual *Miranda* law in Maryland. There is no local prescribed catechism of rights and advisements. We could, by statute or caselaw, have created such a body of Maryland law, of course, but we never have. *Miranda* and its vast implementing progeny are exclusively federal phenomena. Even if we had a home-grown Maryland "fruit of the poisonous tree" doctrine, it would have to be triggered by a Maryland constitutional violation. A Maryland exclusionary syllogism cannot start with a *Miranda* violation.

If the fact that a *Miranda* infraction is not a violation of Maryland law were not foreclosing enough to the appellant's independent state grounds argument, the *coup-de-grace* would be that neither is the entire "fruit of the poisonous tree" doctrine. The two definitive examinations of that doctrine were those by Chief Judge Orth for this Court in *Ryon v. State,* 29 Md.App. 62, 63–72, 349 A.2d 393 (1975), and by Judge Cole for the Court of Appeals in *Ferguson v. State,* 301 Md. 542, 547–50, 483 A.2d 1255 (1984). They both made it transparently clear that it is a federal exclusionary doctrine imposed on Maryland from above and not a doctrine that has any local roots.

There is no Maryland counterpart to *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). There are no Maryland counterparts to *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), and *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). If the Supreme Court were to overrule *Silverthorne Lumber Co., Nardone,* and *Wong Sun* tomorrow, there would be no mechanism for the exclusion of derivative evidence in Maryland. It might be wise to investigate what Maryland law really is before opting for independent state grounds. Defendants had best be careful what they wish for,

for significant chunks of our truly independent state law come out of the 1930's and 1940's, and that was not a happy time for criminal defendants. That state of the law, however, is what independent state grounds might be sending defendants back to, and not to a dissenting opinion by Justice Brennan in *Oregon v. Elstad.*

Indeed, our Court of Appeals regularly rejected the reception of even the federal "fruit of the poisonous tree" doctrine in Maryland, *Prescoe v. State,* 231 Md. 486, 191 A.2d 226 (1963); *Mefford v. State,* 235 Md. 497, 201 A.2d 824 (1964), until it recognized in *Everhart v. State,* 274 Md. 459, 479 n. 4, 337 A.2d 100 (1975), that it had no choice but to accept it. See also *Ferguson v. State,* 301 Md. at 547 n. 2, 483 A.2d 1255.

If we, in flight from *Oregon v. Elstad,* were to look at independent Maryland law, therefore, we might not be modifying the operation of the "fruit of the poisonous tree" doctrine. We might well be rejecting it in its entirety. If we had ever promulgated our own "fruit of the poisonous tree" doctrine, we could, of course, modify it, but we have never had such doctrine as a part of Maryland law. We may not modify a procedure that is not ours.

### Voluntariness of the *Miranda* Waiver

Before making the written confession now in issue, the appellant, at approximately 9:00 p.m., was advised of his rights under *Miranda* and he agreed to waive those rights. This particular subcontention is that his waiver of *Miranda* rights was not voluntary.

Just prior to the *Miranda* warnings, to be sure, the appellant, while still un*Mirandized,* had, according to his interrogator, "hung his head down and said, 'Yeah, they were broken down on the side of the road, and that's when this white guy came up to give them a jump start, and the other people with him shot the man and took his truck." At that moment, the interrogator told the appellant that he "needed to get that in writing." The *Miranda* warnings and waiver immediately followed.

The appellant claims that, under those circumstances, the waiver was not voluntary. That may well be so, but it does not follow as a matter of law. The hearing judge found that the waiver was voluntary, and there was abundant evidence to support such a finding. The appellant signed and initialed a Waiver of Rights form which was introduced into evidence.

Most significant, there was only one witness who testified at the suppression hearing. He was Defective Sergeant Norman P. Miller, who conducted the interrogation. He testified to an atmosphere that was cordial, relaxed, and cooperative. With respect to his credibility, Judge Spellbring found:

[H]aving had the opportunity to observe Detective Miller when he testified, I find Detective Miller's testimony to be credible. And I do believe and give credence to the testimony that he gave in this hearing on May 6th, 1999.

The only person who might have testified to the contrary was the appellant himself. If the appellant felt too pressured to resist, realistically only the appellant could have told the judge that. The appellant chose not to testify. There was no testimony, therefore, to refute that of Sergeant Miller. Fully supported by Sergeant Miller's testimony, Judge Spellbring found:

Mr. Ashford was advised of his rights under the *Miranda* decision pursuant to the Prince George's County Police form that was received as State's Exhibit Number 1.... The form was begun at approximately 8:56 p.m.

Pursuant to that form that had been received, Mr. Ashford was advised of his rights. He waived those rights by marking the appropriate yes or no block after the questions and then initialing that line. He then signed the form also, indicating that he had a 12th grade education. The statement was then begun with the first paragraph on the first page being written by Mr. Ashford.

Judge Spellbring's ruling with respect to the voluntariness of the *Miranda* waiver inevitably followed:

Based on these findings of fact, I find that Mr. Ashford was advised fully of his rights under the *Miranda* decision

pursuant to State's Exhibit number 1; that he knowingly, intelligently, and voluntarily waived those rights pursuant to the responses to the waiver questions on State's Exhibit number 1 and his initials and signature.

There is no conceivable way that we could reverse that ruling. Accordingly, we hereby affirm it.

## Voluntariness of the Statement

■ For essentially the same reasons that we affirmed Judge Spellbring's ruling that the appellant's waiver of his *Miranda* rights was voluntary, we also affirm Judge Spellbring's ruling that the ensuing statement itself was voluntary. There is almost a Newtonian principle at work that the voluntariness that validated the *Miranda* waiver continued unabated through the immediately ensuing statement.[12]

Once again, the only witness at the suppression hearing with respect to the statement was Sergeant Miller. Not surprisingly, his testimony described an interrogation session overflowing with bonhomie. Once again, Judge Spellbring found Sergeant Miller's testimony to have been fully credible.

---

12. That essential identity of issues is why, as a general rule, whenever *Miranda* is both 1) applicable and 2) satisfied, the voluntariness test is *ipso facto* satisfied at the same time. There need only be one inquiry instead of two. There are some rare situations calling for special treatment. See, e.g., *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (They were both rare custodial interrogation situations in which *Miranda* was nonetheless inapplicable). Indeed, the Supreme Court observed in *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984):

 Cases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.

 Where a *Miranda* challenge is raised but *Miranda* is ruled to be inapplicable (as opposed to satisfied), on the other hand, the undergirding voluntariness challenge, if raised, is not so easily finessed.

 In *Hof v. State*, 97 Md.App. 242, 285–94, 629 A.2d 1251 (1993), *rev'd on other grounds*, 337 Md. 581, 655 A.2d 370 (1995), this Court analyzed in some depth why the satisfaction of *Miranda* is almost always an *ipso facto* satisfaction of the voluntariness test embodied in the Fifth and Fourteenth Amendments.

Judge Spellbring's findings of first-level facts, fully supported by Sergeant Miller's testimony, are accepted for purposes of this review as gospel. *Marr v. State,* 134 Md.App. 152, 163, 759 A.2d 327 (2000).

When the issue is voluntariness, rather than *Miranda* compliance, moreover, the failure of a defendant to testify almost forecloses any chance of prevailing. If the issue is *Miranda* compliance, by contrast, the testimony of the defendant is not nearly so critical. The purely objective issues of 1) whether the *Miranda* warnings were given, 2) precisely when they were given, and 3) what the warnings consisted of can be attacked by forceful cross-examination of the interrogating officer or by getting two officers to contradict each other. The voluntariness of a defendant's response to possible pressures, on the other hand, is very subjective. Only the defendant can truly tell us what was going on in the defendant's mind. Without such testimony, there is usually no direct evidence of involuntariness.

The appellant grandly quotes *Hoey v. State,* 311 Md. 473, 483, 536 A.2d 622 (1988), for the proposition that a confession is inadmissible if it has been "induced by force, undue influence, improper promises, or threats." That unremarkable proposition is then left hanging there, as he offers no shred of evidence of any "force" or of "undue influence" or of "improper promises" or of "threats" or, indeed, of having had his confession "induced by" anything. He asks us to guess what was in his head. He actually asks us to second-guess Judge Spellbring for not having guessed.

As Judge Spellbring found, the appellant, when interrogated, was in lawful custody for the "Dunkin Donuts" case. The appellant was not under the influence of drugs or alcohol. The appellant was given cigarettes, a Coca Cola, a hamburger, and water during the interview. Most significant, Judge Spellbring found that the appellant had affirmatively expressed a desire to talk to the officers. In rendering his opinion, Judge Spellbring observed:

The statement was then begun with the first paragraph on the first page being written by Mr. Ashford.

The question and answers subsequent to that paragraph were in the handwriting of Detective Miller, the statement was concluded at 2:48 a.m. on October 20th. Detective Miller denies that any promises, threats, or inducements were made to Mr. Ashford to obtain this statement. *He testified that Mr. Ashford said that he was glad to talk to him.*

(Emphasis supplied). Judge Spellbring expressly found that at the very outset of the interrogation, "Mr. Ashford told Detective Miller that he did want to speak to him."

Even with respect to the earlier statements, suppressed because of the *Miranda* violation, Judge Spellbring nonetheless found "that they are voluntary based on the evidence before me." The earlier *Miranda* violation had no adverse impact on the voluntariness of the subsequent statement.

I find that based upon the willingness and desire even of Mr. Ashford to talk to the Prince George's County Police on October 19th, that the statements taken without advisement and waiver of the *Miranda* rights do not affect the voluntariness of the statements that I have received as State's Exhibit number 2, the written statement and the question and answer statement of Mr. Ashford.

Judge Spellbring's final ruling was amply supported by his findings of fact and by the evidence.

I find that because of his willingness and desire as expressed to the police to talk to them on that night, that the statement received as State's Exhibit number 2 is a voluntary statement made after the appropriate advice and waiver of the rights under the *Miranda* decision as contained without State's Exhibit number 1, and for the reasons contained herein I will deny the defense motion to suppress State's Exhibit number 2.

We affirm that ruling.

### 3. THE TESTIMONIAL PRIVILEGE ISSUE

The appellant's contention that Judge Spellbring erroneously permitted a testimonial reference by a police sergeant to a

statement made by the appellant's wife actually consists of the two subcontentions:

a. that the State violated the testimonial privilege protecting confidential communication between husband and wife, and

b. that the declaration by the appellant's wife contained hearsay within inadmissible hearsay.

As the State was attempting to qualify the appellant's written confession for admission into evidence, Sergeant Miller was on the stand explaining the circumstances of the interrogation session. Initially the appellant had denied any involvement in the Youmans murder. It was only when Sergeant Miller confronted the appellant with the fact that his wife had revealed to the police his involvement in the murder that the appellant broke down and admitted that involvement. The critical testimony was as follows:

[The State]: Okay. And initially, what did [appellant] say to you during the initial stages of the conversation that you had with him?

[Sgt. Miller]: Okay. In the initial statement he stated he had nothing to do with it. And then after that, after I told him that we heard from his wife, who was involved in it—

[Defense Counsel]: Objection.

THE COURT: Overruled.

[Sgt. Miler]: After I told him that, the statement was then taken and he admitted to his involvement.

[The State]: Specifically, what did you tell [appellant] regarding the conversation with his wife?

[Sgt. Miller]: *I told him his wife had already told us that—*

[Defense Counsel]: Objection.

THE COURT: Overruled.

[Sgt. Miller]:*—that [appellant] was involved with this, with Ed, Donnie and John, who are associates of his.*

[The State]: And after you told [appellant] that, what happened next?

[Sgt. Miller]: After that I read him his rights and took a statement from him, where he admitted to his involvement.

(Emphasis supplied).

## The Testimonial Privilege For Confidential Spousal Communications

The appellant now claims that his privilege to exclude a confidential communication between husband and wife was violated.

### A. Which Spousal Privilege Is Being Invoked?

Just for quick orientation, it behooves us to note that there are in Maryland two spousal privileges. The first concerns protecting confidential communication between husband and wife. Both its history and its contours were thoroughly explored by Judge Wilner in *Brown v. State,* 359 Md. 180, 753 A.2d 84 (2000). It was first enacted by the Maryland General Assembly in 1864, was apparently inadvertently repealed in 1876, and was reenacted in 1888. It is now codified as Maryland Code, Courts and Judicial Proceedings Article, § 9–105.

One spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage.

 That privilege is available in civil and criminal trials alike and may be asserted by the spouse who uttered the confidential communication. See *Coleman v. State,* 281 Md. 538, 380 A.2d 49 (1977); *State v. Enriquez,* 327 Md. 365, 609 A.2d 343 (1992). See also Joseph F. Murphy, Jr., *Maryland Evidence Handbook,* § 904(B), pp. 322–23; Lynn McLain, *Maryland Evidence* (1st ed.1987), Sect. 505.2, pp. 548–51.

 The second spousal privilege, limited to criminal trials only, provides that one spouse, albeit competent to testify if he or she wishes to do so, is, generally speaking, not a compellable witness against the other spouse who is on trial for a crime. That privilege was thoroughly explored by Judge Hollander in *Hagez v. State,* 110 Md.App. 194, 207–27, 676

A.2d 992 (1996). That privilege is codified in *Courts Article,* § 9–106, which provides in pertinent part:

(a) In general.—The spouse of a person on trial for a crime may not be compelled to testify as an adverse witness unless the charge involves:

(1) The abuse of a child under 18; or

(2) Assault in any degree in which the spouse is a victim if:

(i) The person on trial was previously charged with assault in any degree or assault and battery of the spouse;

(ii) The spouse was sworn to testify at the previous trial; and

(iii) The spouse refused to testify at the previous trial on the basis of the provisions of this section.

See Murphy, § 904(A), p. 322; McLain, § 505.1, pp. 545–48.

The difference between the two spousal privileges is well explained by Murphy, *Maryland Evidence Handbook,* § 904, p. 321.

Sections 9–105 and 9–106 of the Courts and Judicial Proceedings Article contain *the spousal privileges. There are two.* One is held by the potential witness who is called to testify for the state in a criminal prosecution of his or her present spouse. *One is held by the person who seeks to prohibit disclosure of confidential communications between husband and wife at a time when they were married to one another.* C.J. 9–106 does not apply unless the witness and defendant are husband and wife at the moment when the witness is called to the stand by the state. C.J. 9–105 applies to all confidential communications that occurred during the marriage regardless of whether the marital relationship has been terminated before trial.

(Emphasis supplied).

It is the confidential communication privilege, pursuant to § 9–105, that is being invoked by the appellant in this case.

## B. Testimonial Privileges Generally Are Disfavored

■ To place the issue, one involving the privilege for confidential spousal communications, in its proper framework, we begin with the universally recognized principle enunciated by Lord Chancellor Hardwicke in 1742 that "the public has a right to every man's evidence." [13] *Kastigar v. United States,* 406 U.S. 441, 443, 92 S.Ct. 1653, 1655, 32 L.Ed.2d 212, 216 (1972); *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626, 644 (1972). The fundamental nature of this obligation [14] and the generally dim view taken by the common law toward any exemptions from this general obligation were well summarized by Dean Wigmore in 8 *Wigmore*

---

**13.** From the Parliamentary debate on the Bill to Indemnify Evidence reported in 12 T. Hansard, *Parliamentary History of England* 675, 693 (1812).

The power to compel the attendance and the testimony of witnesses dates from the Statute of Elizabeth, 5 Eliz. 1, ch. 9, § 12 (1562). *See also Dobson v. Crew,* 78 Eng. Rep. 940 (1599). It was of this statutory duty that Sir Francis Bacon spoke in Countess of Shrewsbury's Trial, 2 How. St. Tr. 769, 778 (1612):

"You must know that all subjects, without distinction of degrees, owe to the king tribute and service, not only of their deed and hand, but of their knowledge and discovery. . . . [I]f they be called and examined, whether it be of their own fact or of another's, they ought to make direct answer."

**14.** This overriding duty to provide to the courts all available information was no respecter of class. As Jeremy Bentham initially hypothesized in 1827:

"Were the Prince of Wales, the Archbishop of Canterbury, and the Lord High Chancellor, to be passing by in the same coach while a chimney-sweeper and a barrow-woman were in dispute about a halfpennyworth of apples, and the chimney-sweeper or the barrow-woman were to think proper to call upon them for their evidence, could they refuse it? No, most certainly."

4 *The Works of Jeremy Bentham* 320 (Bowring ed. 1843). Dean Wigmore has pointed out, in 8 *Wigmore on Evidence* (McNaughton rev.1961), at 71 n. 2, that Bentham's illustration came very nearly true in *Rex v. Baines,* 1 K.B. 258 (1909), in which the Prime Minister and the Home Secretary were subpoenaed to testify as to a breach of the peace committed at a meeting where they were present, and also in Baccarat Trial (*Gordon–Cumming v. Wilson* ), *Notable British Trials* Series 3, 75 (1891), in which the plaintiff, suing for slander for having been falsely charged with cheating at cards, summoned and obtained the testimony

*on Evidence* (McNaughton rev.1961), § 2192, "Duty to give testimony," at 70:

"For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving and that *any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.*"

(Emphasis supplied).

In *Ellison v. State,* 65 Md.App. 321, 325–26, 500 A.2d 650 (1985), *rev'd on other grounds,* 310 Md. 244, 528 A.2d 1271 (1987),[15] this Court explored the general disfavor with which testimonial privileges are viewed:

Following from this general obligation to assist the search for truth with all available knowledge, the ancillary principle is also well settled that *all of the various testimonial privileges, as derogations from full and accurate fact finding, are looked upon with disfavor.* Dean McCormick surveyed the landscape in his article *The Scope of Privilege in the Law of Evidence,* 16 Tex. L.Rev. 447 (1938), and observed, at 468, "The courts often say that *privileges, since they curtain the truth from disclosure, should be strictly construed.*" He went on more fully, at 469:

"The development of judge-made privileges halted a century ago. The manifest destiny of evidence law is a progressive lowering of the barriers to truth. Seeing this tendency, the commentators who take a wide view, wheth-

---

of the Prince of Wales, who had taken part in the card game at a private home.

**15.** Whereas this Court spoke of all testimonial privileges being viewed with disfavor and, therefore, tightly construed, the Court of Appeals exempted from this general disfavor the constitutional privilege against compelled self-incrimination. In other respects, the opinion of this Court was untouched.

er from the bench, the bar, or the schools, seem generally to advocate a narrowing of the field of privilege."

He concluded, "One may hazard a guess ... that in a secular sense privileges are on the way out."

(Emphasis supplied).

The United States Court of Appeals for the Second Circuit noted in *In Re Cueto,* 554 F.2d 14, 15 (2d Cir.1977):

· "It is a fundamental rule of law that the public has a right to every persons' evidence. There are a small number of constitutional, common-law and statutory exceptions to that general rule, but *they have been neither 'lightly created nor expansively construed, for they are in derogation of the search for truth.'* "

(Emphasis supplied).

The same general approach to testimonial privileges was followed by the Supreme Court in *Branzburg v. Hayes,* 408 U.S. 665, 690 n. 29, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). "The creation of new testimonial privileges has been met with disfavor by commentators since such privileges obstruct the search for truth." *See also* Mason Ladd, *Privileges,* 1969 Law & Soc. Ord. 555; *Falsone v. United States,* 205 F.2d 734 (5th Cir.1953). And see *Matthews v. State,* 89 Md.App. 488, 503, 598 A.2d 813 (1991).

Murphy, *Maryland Evidence Handbook,* § 900, p. 312, speaks to the same effect.

It is obvious that evidence excluded on grounds of privilege increases the danger of an incorrect verdict. *The privilege laws are therefore given a narrow, strict construction.*

(Emphasis supplied).

McLain, *Maryland Evidence,* § 501.1, p. 463, has similarly observed:

Not only are those statutory privileges which did not exist at common law strictly construed because they are in dero-

gation of the common law, but *all privileges are strictly construed because they exclude relevant, reliable evidence.* (Emphasis supplied).

1 *McCormick on Evidence* (4th ed. by J.W. Strong, 1992), p. 275, also comments on the strict construction given to testimonial privileges.

"Since privileges operate to deny litigants access to every man's evidence, *the courts have generally construed them no more broadly than necessary to accomplish their basic purposes.*"

(Emphasis supplied).

In *United States v. Mandel,* 415 F.Supp. 1025, 1030 (D.Md. 1976), the federal District Court of Maryland also took note of the disfavored status of privileges generally.

Since privileges by their very nature take from the trier of fact's consideration evidence which is frequently relevant, and are therefore considered to be in "derogation of the search for truth", *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the law sustains a claim of privilege only when necessary to protect and preserve the interest of significant public importance that the specific privilege is designed to serve.

Dean Wigmore has pointed out not only that these exceptions from the general duty are "to be discountenanced" and "should be recognized only within the narrowest limits" but also that, sometimes caught up in an apparently lofty purpose and losing their larger perspective, "judges and lawyers are apt to forget this exceptional nature." The appropriate attitude toward the testimonial privileges was unmistakably prescribed in 8 *Wigmore on Evidence* (McNaughton rev.1961), § 2192, "Duty to give testimony," at 73:

"*[A]ll privileges of exemption from this duty are exceptional, and are therefore to be discountenanced.* There must be good reason, plainly shown, for their existence. In the interest of developing scientifically the details of the various recognized privileges, judges and lawyers are apt to forget this exceptional nature. The presumption against their

extension is not observed in spirit. The trend of the day is to expand them as if they were large and fundamental principles, worthy of pursuit into the remotest analogies. This attitude is an unwholesome one. The investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion, of these privileges. *They should be recognized only within the narrowest limits required by principle. Every step beyond these limits helps to provide, without any real necessity, an obstacle to the administration of justice.*"

(Emphasis supplied).

Keeping in the forefront of the mind the appreciation that testimonial privileges are disfavored, rather than favored, and are to be strictly construed, rather than liberally construed, is important because that decided "tilt" may well be dispositive in close or ambiguous cases. As this Court observed in *Ellison v. State,* 65 Md.App. at 326–27, 500 A.2d 650:

[A] brief word is in order as to why it is important for us to determine whether testimonial privileges are in favor or disfavor. *In an otherwise close case* for the application of a testimonial privilege, a case that could plausibly go either way, *the "tilt" to be taken by the court is critically important.* If testimonial privileges are determined to be in favor, our "tilt" toward finding the privilege applicable could well be decisive in that direction. *If,* on the other hand, *testimonial privileges are determined to be in disfavor, our "tilt" toward finding the privilege inapplicable could well be decisive* in the other direction.

(Emphasis supplied).

With that universally recognized "tilt" clearly in mind, we turn our attention to the information furnished to Sergeant Miller by the appellant's wife and to its admissibility under the circumstances of this case. The appellant's subcontention is flawed in a number of respects.

## C. The Privilege Was Never Invoked

First and foremost among the things that one claiming a privilege must do is actually to assert the privilege. In

this case, the appellant never did. Twice during the critical direct examination of Sergeant Miller, appellant's counsel said the single word, "Objection." The most likely basis for such an objection was that the sergeant was testifying to a hearsay declaration by the appellant's wife.

In no event was the subject of a confidential communication between the appellant and his wife alluded to nor was § 9–105 even mentioned. The privileged status of a confidential spousal communication as the basis for the objection was by no means apparent, for the entitlement to such a privilege would not be automatic but would require at least several preliminary showings.

In *Matthews v. State,* 89 Md.App. 488, 598 A.2d 813 (1991), an issue was whether the defendant had adequately invoked the privilege for a confidential spousal communication. This Court held that he had, based on the following facts:

> Prior to Ms. Matthews taking the stand before the jury, *appellant objected to her testimony on* both *confidential communication* and voluntariness *grounds. Specifically with respect to confidential communications, defense counsel stated:*
>
> > "I want to state for the record my position regarding confidential communications. My client is not waiving any privilege that he has in having those confidential communications with this witness excluded."

89 Md.App. at 500, 598 A.2d 813 (emphasis supplied). Under those circumstances, we held that the subject had been properly brought to the trial judge's attention.

> *Clearly, the confidential communication issue was brought to the trial judge's attention,* and he overruled the objection on a continuing basis. This issue has been preserved for our review.

*Id.* (emphasis supplied).

By contrast with *Matthews,* the unilluminating word "objection" in this case, even repeated a second time, does not pass muster. A trial judge does not have to guess about the possibility of a testimonial privilege's being invoked. Indeed,

the very issue of a testimonial privilege for a confidential spousal communication appears to be just as much an appellate afterthought as was the previously discussed "*Merrick–Barber* Rule" for unnamed confidential informants.

## D. The Wife's Information Was Not Shown to Have Been Based on a Communication

 Because a testimonial privilege is a disfavored departure from the norm, the burden is on the party asserting the privilege to prove each and every element necessary to establish entitlement to the privilege. *In Re Criminal Investigation No. 1/242Q*, 326 Md. 1, 11, 602 A.2d 1220 (1992) ("[T]he burden of establishing a privilege rests on the party asserting the privilege."). Lynn McLain, *Maryland Evidence* (2d ed., 2001) states at § 501.1c, p. 9:

> The party or person seeking to invoke the privilege has the burden of proving necessary preliminary facts, to the trial judge's satisfaction under Md. Rule 5–104(a), by a preponderance of the evidence.

Rule 504(a), in turn, provides that a trial judge may not relax the "strict application of the rules of evidence" when dealing with "the existence of a privilege." And see *Hagez v. State*, 110 Md.App. 194, 210 n. 5, 676 A.2d 992 (1996).

At the outset, it was not established at the time the objection was ruled on that the police had necessarily even talked to the appellant's wife. Sergeant Miller had not testified that he had talked to the appellant's wife. He simply told the appellant that he had. It is a familiar interrogation technique to mislead a suspect and to deceive him into believing 1) that a confederate has implicated him, *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); 2) that a relative has "given him up;" or 3) that even a non-existent witness has identified him as having been at the scene. In no event would the privilege extend to merely fabricated disclosures of a confidential communication, when a fabrication is used to stimulate a response.

Even assuming that the report from the appellant's wife were genuine, however, there was no showing that the wife's knowledge of her husband's involvement in the Youmans murder was based on any communication, let alone a confidential communication, from him to her. The burden, of course, was at all times on the appellant to establish his entitlement to the privilege by showing each and every necessary element.

Sergeant Miller's reference to what the wife had said consisted of a single sentence:

I told him his wife had already told us that he was involved with this, with Ed, Donnie, and John, who are associates of his.

There is nothing in that sentence about the basis of the wife's knowledge. She may have seen her husband return home with the shotgun on the night of the murder. She may have seen him and his confederates dividing the spoils from the robbery of Youmans. She may have heard an account of what happened from Ed or from Donnie or from John. She may have overheard the group or some of the group discussing what had happened. She may have pieced together various fragments of information to form her conclusion as to the appellant's involvement. The burden of proving that the wife's knowledge was based on a communication from the appellant was on him, and he never carried that burden.

In his appellate brief, to be sure, the appellant points to clues in this regard that could be gleaned from the contents of his written confession. That confession, however, was not yet in evidence and its contents were not before Judge Spellbring as he made his ruling. Our job, of course, is not to ferret out the ultimate historic basis of the wife's knowledge, but only to determine whether Judge Spellbring was in error in making an evidentiary ruling.

### E. If There Was a Communication, It Was Not Shown to Have Been Confidential

Even if, *arguendo,* the wife's knowledge of the appellant's involvement were based on what he had said to her, that

would not by any means establish that the communication had necessarily been confidential. The burden of establishing the element of confidentiality was also on the appellant. It was not sustained.

If the appellant had spoken to his wife in the presence of a third person, for instance, his communication would not be deemed to have been confidential. *Master v. Master*, 223 Md. 618, 623, 166 A.2d 251 (1960) ("We find nothing confidential in the challenged communication of the husband to the wife. It was made in the presence of children old enough to understand fully what was being said."); *Gutridge v. State*, 236 Md. 514, 516, 204 A.2d 557 (1964) ("The message sought to be sent to the appellant's wife through another cannot be regarded as confidential."); *Mulligan v. State*, 6 Md.App. 600, 615, 252 A.2d 476 (1969) ("The admission made by the appellant to his wife in the presence of the police when he saw her in the room in the police station was not a confidential communication ..., as it was made in the hearing of a third person."). The burden is not on the State to establish the presence of third persons; it is on the appellant to establish their absence.

Groping, after the fact, to establish confidentiality, the appellant points to a single question and answer in the course of his written confession. As we have already discussed, the content of that confession has no bearing on the correctness of Judge Spellbring's evidentiary ruling because it was not something before him as he made that ruling. Just out of academic interest, however, we shall for a moment indulge the appellant, because his conclusion by no means ineluctably follows from his premises. The Q. and A. in the written statement was:

Q. Who else was told about this?

A. Nobody but my wife and Alicia. Alicia heard me say to John that he always likes to shoot somebody like he did that white guy.

From that, the appellant spins the following conclusion with absolute certainty:

Appellant's answer makes it clear that the appellant told his wife of his involvement, and furthermore on a separate

occasion, Alicia overheard a conversation between appellant and an accomplice.

What is there so clear to the appellant is by no means so clear to us. The appellant's brief and ambiguous answer does not yield any certain conclusion that he was describing two separate conversations or that he spoke to his wife alone in one such conversation.[16] The disfavor with which the law looks on testimonial privileges dictates that we resolve an ambiguity against the privilege, rather than in its favor. Again, however, this brief excursus is only academic, for none of this was before Judge Spellbring when he made the evidentiary ruling now in issue.

## F. Testimonial Privilege Only Applies to Act of Testifying

What § 9–105 establishes, moreover, is not an undifferentiated shield against the disclosure of a confidential spousal communication, but only a testimonial privilege. The appellant could have invoked the privilege if his wife had opted to take the stand to testify as to statements that he had made to her in confidence. She never did so, however, and the privilege, even if *arguendo* satisfied in all other regards, has no bearing on this case.

Although dealing with the privilege of one spouse not to be compelled to testify against the other spouse in a criminal case, now codified as § 9–106, rather than the confidential communication privilege, now codified as § 9–105, this Court's decision in *Metz v. State*, 9 Md.App. 15, 262 A.2d 331 (1970), sheds light on the principle that a testimonial privilege deals with testimony and not with out-of-court disclosures.

Metz's wife invoked her privilege not to testify against her husband and it was honored. When a state trooper, however, went to testify as to what the wife had told him about Metz's

---

16. There is another theory erosive of confidentiality, moreover, that a similar, even if separate, admission of involvement to Alicia would indicate that the same admission to his wife was not intended to be confidential.

guilt, defense counsel objected. When asked the basis for the objection, counsel's reply very much resembled the argument made by the appellant in this case:

Defense counsel replied, "Your Honor, I am objecting on the grounds that Mrs. Metz has exercised her right not to testify against her husband and by allowing this statement in the Court will be allowing her to testify indirectly when she has refused to testify for the record."

9 Md.App. at 18, 262 A.2d 331.

Metz's argument on appeal very much resembled the appellant's argument in this case.

Appellant claims that the admission of the wife's statements was error, relying on Code, Art. 35, § 4 [now § 9–106]. He argues that to allow the wife's statements in evidence through the officer, in the light of her refusal to testify, defeats the entire purpose of the statute.

*Id.*

Judge Orth, writing for the Court, held that the statutory privilege concerned testimony and not out-of-court statements.

Mrs. Metz invoked her statutory right not to testify and it was honored. *We construe the statute to mean exactly what it says, that a husband or wife shall not be compelled "to testify* as an adverse party or witness." *Mrs. Metz was not compelled to testify* and there was therefore no error. We are not persuaded that we should otherwise construe the specific and unambiguous language of the statute or convinced that we have the power, in any event, to depart from what we believed, to be the clear legislative intent. *We do not find that it was the legislative intent to exclude statements,* otherwise admissible, *voluntarily made by one spouse to police officers,* simply because that spouse refuses to testify against the other. We hold that Code, Art. 35, § 4 [now § 9–106] does not preclude the admission of the challenged statements.

9 Md.App. at 19–20, 262 A.2d 331 (emphasis supplied).

*Chase v. State,* 120 Md.App. 141, 706 A.2d 613 (1998), deals directly with the spousal confidential communication privilege, codified as § 9–105. Judge Alpert there framed the issue:

May the State use evidence otherwise protected by the marital communication privilege, codified in Md.Code § 9–105 (1995 Repl.Vol.) of the Courts and Judicial Proceedings Article, in a determination of whether it has probable cause for an arrest or a search?

120 Md.App. at 144, 706 A.2d 613. As we proceed to examine the Court's resolution of that question, we see no difference between using the revelation of a confidential communication to develop probable cause, as in that case, and to use it in the course of an interrogation, as in this case.

Both probable cause to arrest Chase warrantlessly and probable cause for a warrant to search his home were predicated in significant measure on inculpatory statements that Chase had made to his wife and that the wife, in turn, revealed to the police. The appellant's argument there replicated precisely the appellant's argument here.

*Appellant points out that the police relied not just on the earring, but also on the statement by appellant to Mrs. Chase that he had taken the jewelry from two young girls. Appellant argues that that statement was privileged under § 9–105,* and that the police were therefore not entitled to rely on it, in their probable cause assessment.

120 Md.App. at 146, 706 A.2d 613 (emphasis supplied).

This Court's holding was clear:

We do not read § 9–105 to prohibit the use of privileged marital communications in a probable cause determination. Accordingly, we reject appellant's argument.

*Id.*

Judge Alpert's opinion found support in the Court of Appeals's decision in *State v. Mazzone,* 336 Md. 379, 389, 648 A.2d 978 (1994).

Our interpretation of §§ 9–105 and 9–106 is also strongly supported by the ruling of the Court of Appeals in *State v. Mazzone.* There, one of the primary issues was whether § 9–105 prohibits the State from eavesdropping and intercepting confidential communications between spouses. *The*

*Court ruled that § 9–105 only "concerns the competency of spouses to testify as to marital communications;* it does not prohibit or even mention eavesdropping." The Court also noted that *any attempt to broaden the reach of § 9–105 beyond the context of a judicial proceeding must be effectuated by the legislature, and not the courts.*

120 Md.App. at 147, 706 A.2d 613 (emphasis supplied).

Both spousal privileges were held to be limited to testimony by witnesses in judicial proceedings.

[I]t is clear that *§§ 9–105 and 9–106 apply only to witnesses in judicial proceedings, and not to police investigations* of criminal activity. This interpretation is supported by the fact that *these two provisions are located in Title 9, which governs witnesses in judicial proceedings.*

*Id.* (emphasis supplied).

### Hearsay: "An Assertion Offered For the Truth of the Thing Asserted"

 As an alternative subcontention, the appellant complains that Sergeant Miller's testimony with respect to the appellant's wife was inadmissible hearsay. The appellant mischaracterizes the problem, even if we were to accept his best scenario, as a problem of "hearsay within hearsay." He relies on Maryland rule 5–805, dealing with "Hearsay within hearsay."

### A. At Most, This is a Hearsay Problem, Not a Hearsay Within Hearsay Problem

Sergeant Miller was a witness on the stand, under oath and subject to cross-examination. *Arguendo,* he testified as to something told to him by the appellant's wife. That statement by the wife, depending on the purpose for which it was offered, could be primary hearsay. *Arguendo,* the wife told the sergeant about something earlier told to her by her husband. That statement, from husband to wife, would be secondary hearsay or hearsay within hearsay. At best from the appellant's point of view, the scenario would look like this:

| Witness On Stand (Sgt.Miller) | Primary Hearsay Declarant (Wife) | Secondary Hearsay Declarant (Husband) |
|---|---|---|
| I spoke to the wife and she said, | "I spoke to my husband and he said, | 'I did it.' " |

In that scenario, there would be no problem with the admissibility of the secondary hearsay or hearsay within hearsay because it, as an admission by a party-opponent, would qualify as a firmly-rooted exception to the Rule Against Hearsay, now codified as Maryland Rule 5–803(a)(1). An inculpatory declaration by the husband/appellant would be deemed trustworthy with flying colors.

The admissibility problem would be with the primary hearsay declaration by the wife, which would not seem to qualify as trustworthy under any of the recognized exceptions to the Hearsay Rule. The fact that the wife's hearsay declaration included hearsay within hearsay would be beside the point. Her hearsay declaration would have been equally inadmissible whether it asserted, "I know my husband was involved because he told me he was involved," or, "I know my husband was involved because I saw him do it."

Thus, preliminarily, our issue is a simple hearsay problem and not a hearsay within hearsay problem. The wife's assertion is the only one that matters. The question is whether the wife's out-of-court assertion was, indeed, hearsay.

### B. The Purpose For Which the Wife's Assertion Was Offered

Maryland Rule 5–801(c) defines hearsay:

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

That is completely in line with the long established law school understanding of hearsay as "an out-of-court assertion offered in court for the truth of the thing asserted." Assuming, *arguendo*, that Sergeant Miller even spoke to the appellant's wife, anything that she told him was an out-of-court

assertion. As part of his testimony, it was offered in court by Sergeant Miller. Whether it was, in the last analysis, hearsay depends on the purpose for which it was offered.

In *Richardson v. State,* 324 Md. 611, 621, 598 A.2d 180 (1991), Judge Chasanow stressed that an out-of-court statement's status as hearsay depends on what it was offered to prove.

> In ruling on the admissibility of hearsay evidence, *the trial judge must examine the nature of the out-of-court statements, as well as what they are offered to prove.* Without objection, defense counsel elicited from Marll that McCoy told Marll that he had a phone call from Richardson at 7 a.m. and met with Richardson at 8 a.m. The purpose of offering McCoy's hearsay was not to establish *what* McCoy heard from Richardson, but was to establish *when* McCoy heard from Richardson.

(Emphasis supplied).

In *Ali v. State,* 314 Md. 295, 304, 550 A.2d 925 (1988), Judge McAuliffe stressed the point that out-of-court statements, even when offered in court, are frequently not hearsay at all.

> Logically, *the first inquiry ought to be whether the words are hearsay at all.* If they are not, their admission would not offend the hearsay rule. If they are, a further analysis must be undertaken to determine whether there exist separate circumstantial guarantees of trustworthiness sufficient to permit their admission as an exception to the hearsay rule.
>
> Hearsay is generally defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Thus, *when a statement is offered for some purpose other than to prove the truth of the matter asserted therein, it is not hearsay.*

(Emphasis supplied). See also *Conyers v. State,* 354 Md. 132, 157–58, 729 A.2d 910 (1999); *Stewart v. State,* 342 Md. 230, 236, 674 A.2d 944 (1996).

In *Hardison v. State,* 118 Md.App. 225, 234, 702 A.2d 444 (1997), Judge Deborah Eyler wrote for this Court:

> [W]hether an out-of-court statement is hearsay depends upon the purpose for which the statement is offered at trial. *A statement that is offered substantively, to prove the truth of its contents, is hearsay,* and is not admissible unless an exception to the rule against hearsay applies or admission into evidence is constitutionally required or statutorily allowed. Maryland Rule 5–802; *Stewart v. State,* 342 Md. 230, 236, n. 1, 674 A.2d 944, 947, n. 1 (1996). By contrast, *a statement that is offered for a purpose other than to prove its truth is not hearsay at all.*

(Emphasis supplied).

Judge Thieme explained in *Daniel v. State,* 132 Md.App. 576, 589, 753 A.2d 545 (2000), how statements made by witnesses to police officers, recounted in court by the police to explain the course of the investigation, are frequently not hearsay at all.

> Assuming Sergeant Pellegrini's testimony was based on Bailey's statements, *appellant's contention* that the testimony was "based upon hearsay" *rests on the assertion that Bailey's statements were "hearsay." This is simply not the case.* As the trial court correctly reasoned, what the officer "draws upon to make his decisions as an investigator as to arrest or not arrest, is not to adhere to the same rules that we do here." In other words, *an interviewee's statements to an investigating police officer are not "hearsay" unless and until they are offered into evidence for their truth.*

(Emphasis supplied).

*McCray v. State,* 84 Md.App. 513, 518, 581 A.2d 45 (1990), deal with a similar non-hearsay statement offered by a police officer to explain the course of his investigation.

> It is clear to us that the testimony complained of was not hearsay.

> Hearsay is an out of court statement offered to prove the truth of the matter asserted. *The testimony given by Trooper Johnson was not offered to prove the truth of the*

*matter asserted, rather it was offered to explain how Trooper Johnson was able to make contact with McCray and then with Betters.*

(Emphasis supplied).

With respect to the single brief allusion to the appellant's wife, Sergeant Miller was clearly not testifying, at that point in the trial, about the ultimate merits of guilt or innocence. He was attempting to get the appellant's statement introduced into evidence. For several hours, the appellant had been denying his involvement in the Youmans murder. At approximately nine p.m., he suddenly admitted his involvement. It was necessary for the State to show a plausible reason for that sudden change of heart.

The fact that his wife had implicated him in the crime was the catalyst. Sergeant Miller's words to the effect, "Your wife has told me you were involved," were offered not to show the appellant's involvement but to show why the appellant's resistance suddenly cracked. The assertion by the wife was offered to show not the truth of the thing asserted, but simply to show that the appellant heard that assertion and reacted to it. The assertion in question was not hearsay, and Judge Spellbring was not in error in overruling the appellant's objections to Sergeant Miller's testimony.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**